## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RON MILLER, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>SONUS NETWORKS, INC., RAYMOND P. DOLAN, MARK T. GREENQUIST, AND MICHAEL SWADE<br><br>          Defendants. | Civil Action No.: 18-cv-12344<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Ron Miller ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sonus Networks, Inc. ("Sonus" or the "Company"), Company press releases, media and reports about the Company, and the SEC Order dated August 7, 2018 in the administrative proceeding styled *In re Ribbon Commc'ns Inc., et al.*, File No. 3-18624 ("SEC Order"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of Sonus[1] during the period of January 8, 2015 and March 24, 2015, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class"). On behalf of himself and the Class, Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who issued knowingly false statements during the Class Period.

2.      Sonus provides communication solutions that allow businesses large and small to secure their communications infrastructures. Sonus's early products were hardware-based. As newer, cloud-based software solutions proliferated, however, Sonus fell behind its competitors. In addition, longer purchasing decision cycles exacerbated the Company's troubles, as revenue expected in a particular quarter was pushed into the future and often reduced.

3.      In mid-2014, Sonus hired Michael Swade as its new vice president of worldwide sales, replacing, but not firing, the former head of worldwide sales. Sonus immediately changed the way it forecasted revenue. Where before the Company had included in its revenue forecast each salesperson's "commit number," a conservative estimate of total sales from that employee in

---

[1] On October 30, 2017 Sonus announced the completion of its merger with GENBAND US LLC, each becoming a wholly owned subsidiary of a parent company named "Sonus Networks, Inc." Sonus began conducting business as "Ribbon Communications, Inc." ("Ribbon"), and its NASDAQ ticker symbol was changed from "SONS" to "RBBN."

a particular time period, rather than their "stretch number," an aspirational figure rarely reached, Swade now demanded that sales employees use "stretch numbers" as their minimum target.

4.      On October 23, 2014, Sonus, including those "stretch numbers" in its forecast, projected $74 million in revenue in the first quarter of 2015 ("Q1 2015"). Concurrently, senior sales personnel were informing their superiors in weekly meetings, relayed to Defendants Raymond P. Dolan and Mark T. Greenquist, that the Company would not reach $74 million in revenue in Q1 2015.

5.      Internal communications documented in the SEC Order show that Defendants were aware, long before the turn of the calendar to 2015, that the Company would not achieve $74 million in revenue in Q1 2015. The Company forced sales personnel to list as attainable deals whose chances of closing in Q1 2015 were "fictitious." Defendants convinced employees to relist these potential deals by threatening to fire them.

6.      Nevertheless, on January 8, 2015, Sonus reaffirmed its comfort with analysts' estimates of $74 million in revenue in Q1 2015. On February 18, 2015, Sonus inexplicably projected $74 million in revenue for Q1 2015.

7.      As they reaffirmed the projection, Defendants knew that the Company would fall materially short of the $74 million revenue forecast. Defendants knew that the unrealistic "stretch numbers" remained aspirational and largely unreachable, a fact that senior sales personnel regularly communicated to Defendants. Defendants also knew that a number of 2015 sales had been "pulled forward" to buoy sales numbers in Q4 2014, at management's express direction, and that the "backlog" of sales expected to be recognized in early 2015 was significantly lower than usual. As Q1 2015 progressed, Defendants received continuing updates confirming that the

Company would fall materially short of its sales revenue forecast. All of these facts are proven by internal, contemporaneous Sonus communications.

8.     Sonus could not avoid the reckoning it put off in late 2014 and early 2015. On March 24, 2015, Sonus was forced to reveal its dismal Q1 2015 results. The Company had missed its forecast by a massive amount, taking in only $50 million in revenue. It further emerged that Defendants lied in January and February about the deals they expected to close.

9.     The market reacted immediately to the $24 million revenue miss. On this news, the price of Sonus's stock plummeted $4.46 per share, over 33%, to close at $8.70 per share on March 24, 2018, on unusually high trading volume.

10.     On August 7, 2018, the SEC issued a press release and the SEC Order, stating that the SEC had charged Ribbon, Greenquist, and Swade with making material misstatements on January 8, 2015 and February 18, 2015 concerning Sonus's quarterly revenue estimates and guidance for Q1 2015. The Company, Greenquist, and Swade agreed to pay civil penalties totaling $1.97 million to settle the charges.[2] The SEC Order contained detailed findings of fact, concluding that Sonus, Greenquist, and Swade violated Section 17(a)(2) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 promulgated thereunder.[3]

---

[2] Ribbon was ordered to pay a civil monetary penalty of $1.9 million. Greenquist was ordered to pay $30,000, and Swade, $40,000.

[3] Ribbon, Greenquist, and Swade consented to entry of the order, but neither admitted nor denied the findings contained therein.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. Defendant Sonus maintains its headquarters and conducts business in this District.

14.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.    Plaintiff Ron Miller, as set forth in the certification attached hereto and incorporated herein by reference, purchased Sonus securities during the Class Period and has been damaged thereby.

16.    Defendant Sonus is organized under the laws of the state of Delaware and headquartered in Westford, Massachusetts. Sonus provides networked solutions from communications service providers and enterprises, bringing intelligence and security to real-time

communications. The Company's common stock was listed on the NASDAQ, an efficient market, under the ticker symbol "SONS" until late 2017 when it changed to "RBBN."

17.    Defendant Raymond P. Dolan ("Dolan") was Chief Executive Officer ("CEO") and President of Sonus throughout the Class Period, from October 2010 through December 2017.

18.    Defendant Mark Greenquist ("Greenquist") was Chief Financial Officer ("CFO") of Sonus throughout the Class Period, from November 2013 through June 2016.

19.    Defendants Michael Swade ("Swade") was Vice President of Worldwide Sales and Marketing for Sonus from July 2014 and throughout the Class Period.

20.    Defendants Dolan, Greenquist, and Swade are collectively referred to herein as the "Individual Defendants." Sonus and the Individual Defendants are referred to herein, collectively, as "Defendants."

21.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was aware that the false and misleading statements were being issued concerning the Company; and

(f)    approved or ratified these statements in violation of the federal securities

6

laws.

22.    As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

23.    Sonus is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

24.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sonus under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Sonus's communication solutions allow service providers and enterprises to protect and secure their communications infrastructures by providing 4G/LTE solutions, including Voice over Internet Protocol ("VoIP"), video, instant messaging and online collaboration. Sonus's first products allowed these providers to reduce costs and increase security by switching from the costly Public Switched Telephone Network ("PSTN") infrastructures into the more efficient Internet Protocol ("IP") based models.

26.    As IP-to-IP communications have become more common, Sonus began shifting its product line to provide cloud-based solutions to link and secure multivendor, multiprotocol communications systems and applications across their customers' networks of smartphones and tablets, for all of their employees and all of their offices. Sonus's product focus was on "session border controllers" ("SBCs"), which help secure connections as private communications connect with the public internet.

27.    The shift to IP-to-IP communications with the advent of wireless communications meant a switch to software-based products and solutions. Sonus has acknowledged this shift. In October 2013, Sonus introduced a software-based SBC designed with unlimited scalability and advanced features. The switch to 4G LTE networks created additional security risks and network congestion. Sonus's product focus has more recently shifted to diameter signaling controllers ("DSCs"), which interconnect separate elements and create a central point of control. DSCs are the fastest-growing segment of it business, though not the largest.

28.    Sonus's largest customer historically has been AT&T, which provided approximately 19% of its revenue in 2014, and 15% of its revenue in 2013. Sonus sells its products through a global direct sales force, with additional sales support from regional channel partners throughout the world.

29.    In 2012, Sonus launched an expanded channel partner program, the "Sonus Partner Assure Program," to expand its coverage of the service provider and enterprise markets.

30.    The shift from hardware to software created indecision on the part of Sonus's customers and hurt Sonus's business. Indeed, Sonus customers were shifting to longer decision cycles. During the Q2 2014 Earnings Conference Call on July 30, 2014, Defendant Dolan

confirmed this, acknowledging that "a large order recently expected to score this year is now likely to score in 2015." Defendant Greenquist elaborated on the longer cycles, stating with respect to the same delayed order that "it will be tough to say whether it's going to happen in a single quarter, next year or whether it's going to be multiple quarters." Magnifying Sonus's knowledge that sales cycles were longer, months later, during the Q3 2014 Earnings Conference Call on October 23, 2014, Dolan admitted that there was no certainty that the same order would even come in in 2015, stating "we still ***think*** that will happen in 2015, but not exactly sure in what quarter."

31.    On October 23, 2014, during the Q3 2014 Earnings Conference Call, Sonus expressed comfort with analysts' revenue estimates for the first quarter of fiscal 2015. Defendant Greenquist stated, "we are also comfortable with the current consensus estimates for the first quarter of next year of $74 million in revenue…."

## Sonus Used Salesforce Data to Prepare Quarterly Revenue Guidance

32.    According to the SEC Order,[4] Sonus's sales team was required to input detailed information about potential sales opportunities into the Salesforce program, including estimated revenue and closing date. The sales team was also required to populate a field called "Forecast Category,"[5] which indicated the salesperson's judgment as to whether the deal would close in the relevant quarter. Guidelines provided to the sales team described the three Forecast Categories:

> (1)    "Committed Pipeline" – indicating that the deal "will be won and booked in the quarter identified;"

---

[4] Citations to the SEC Order are designated "SEC Order ¶_."
[5] SEC Order ¶21.

(2)     "Upside" – indicating that the deal was "not in commit because highly competitive or timing of [the purchase order] at risk for the quarter identified"; and

(3)     "Uncommitted Pipeline" – indicating that the deal was "[n]ot in commit because early stage deal."[6]

33.     According to the SEC Order, when preparing its quarterly revenue guidance, Sonus historically relied on the revenue forecasted as "Committed Pipeline," adjusted in accordance with the Regional Vice Presidents for Sales' judgment.[7]

34.     According to the SEC Order, Sonus directed its sales team to "Snap the Line" by the end of the first week of each quarter. "Snap the Line" meant updating the Salesforce database with current forecasts for potential sales for that quarter. Management would measure the sales team's performance against that forecast at the end of the quarter. For Q1 2015, the deadline for "Snap the Line" was January 7, 2015.[8]

**<u>Sonus Hires Swade and Changes Its Revenue Forecasting Policy</u>**

35.     In July 2014, Sonus replaced Todd Abbott as Vice President of Worldwide Sales, hiring Michael Swade to serve in that position. Defendant Swade implemented an immediate change in the Company's policy regarding forecasting revenue. With the knowledge of Defendants Dolan and Greenquist, Sonus began including sales personnel's "stretch numbers" in their forecasts instead of the "commit numbers." Swade pressured sales vice presidents and personnel to forecast unrealistic numbers and to include in the "commit numbers," which were included in quarterly revenue forecasts, leads that sales personnel did not expect to yield revenue

---

[6] *Id.*
[7] SEC Order ¶22.
[8] SEC Order ¶23 & n. 7.

in the short term and leads and deals that were unlikely to close. Swade told Sonus's sales personnel to include more stretch numbers and commit numbers because the actual "commit numbers," as Sonus had defined them until Swade took over, were too low.

36.    Failure to follow Sonus's new direction and to forecast sales that would not or were unlikely to close in a particular quarter as "committed pipeline" had severe consequences for the individual salesperson.

37.    Thus, by late 2014, Defendants had complete visibility into Q1 2015 revenues, as all major customer commitments had been made. Further, they knew that the Q1 2015 revenue forecast included the sales teams' stretch numbers, not their commit numbers, as had been Sonus's practice prior to hiring Swade. As these numbers included potential revenue to which customers had not committed, Defendants knew that the revenue forecast for Q1 2015 was materially inflated.

38.    Further, before Defendants publicly reaffirmed the Q1 2015 revenue forecast on both January 8, 2015 and February 18, 2015, Defendants knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that Sonus would achieve the first quarter sales forecast. Specifically, in weekly meetings in January and early February 2015, the Sonus sales team expressed the specific concern that they could not confirm that AT&T, Sonus's largest customer, would commit to purchase during Q1 2015.

### Sonus Projects $74 Million in Q1 2015 Revenue Despite Knowing it Could Not Achieve its Revenue Goal

39.    The SEC Order, citing to internal Sonus communications, states that to achieve its revenue guidance for Q4 2014, Sonus "pulled forward" certain sales that were initially projected to close in 2015. Sonus's salesforce offered the customers financial incentives in order to close

the deals early, so they could recognize the revenue in Q4 2014. Approximately $18.7 million, or 39%, of Sonus's Q4 2014 product sales revenue was generated from deals that were pulled forward from 2015.[9]

40.    According to the SEC Order, Greenquist recognized that pulling these deals forward from Q1 2015 to Q4 2014 jeopardized Sonus's chances of achieving its Q1 2015 revenue estimate. In an internal email dated October 7, 2014, Greenquist himself stated that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable." On December 26, 2014, one of Sonus's Regional Vice Presidents for Sales emailed Swade that he would have trouble "getting [his] team to Q1 and Q2 Quota/Commit as the [majority of his] teams have drained the pool from all the Q3/4 deals."[10]

41.    According to the SEC Order, Sonus recognized revenue when the product was shipped or, in certain circumstances, delivered to and accepted by the customer. "Backlog" refers to expected revenue from products that had been sold but had yet to be shipped to, or delivered to and accepted by, the customer. At the beginning of Q1 2015, Sonus's backlog was much lower than it was at the beginning of the first quarter in previous years.[11]

42.    According to the SEC Order, Greenquist received reports showing the low backlog *prior to* January 8, 2015. Sonus employees recognized that unusually low backlog created risk for achieving the Company's Q1 2015 revenue estimate. In November 2014, Sonus's Vice President of Global Operations drafted a plan which included increasing the Q1 2015 backlog from a projected $9.4 million to $15 million by "overdriving" bookings in Q4 2014 and pulling forward

---

[9] SEC Order ¶15.
[10] SEC Order ¶16.
[11] SEC Order ¶17 & n. 5.

deals from Q1 2015. "Overdriving" meant entering deals in Q4 2014 where customers would agree to Q1 2015 delivery, so the revenue would be recognized in Q1 2015. However, Sonus was unable to create additional backlog, and it began Q1 2015 with only $6.5 million of backlog, approximately $10.5 million (62%) less than the $17 million in backlog in the beginning of Q1 2014.[12]

43.    According to the SEC Order, Sonus's Vice President of Global Operations expressed concern over whether the Company would be able to achieve its Q1 2015 revenue estimate. On October 23, 2014, the very same day Sonus announced "comfort" with analysts' revenue estimates of $74 million for Q1 2015, he sent an email stating that without adding a large deal to Q1 2015 backlog, $66 million was a more reasonable number for Q1 2015 revenue. He voiced his concerns directly to Greenquist and stated in a November 17, 2014 email that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk. . . . [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."[13]

44.    According to the SEC Order, in the days leading up to the January 8, 2015 press release, Greenquist, Dolan, and Sonus's head of investor relations discussed whether the Company should comment in the press release about Q1 2015 revenue or remain silent on the issue.[14] Greenquist specifically expressed his concern that Sonus could not reaffirm its comfort

_____

[12] SEC Order ¶¶17-19 & n. 6.
[13] SEC Order ¶20.
[14] According to the SEC Order, the head of investor relations explained that it was unusual for Sonus to provide any information about quarterly revenue that early in the quarter and outside of a formal financial results conference call. SEC Order ¶25 n.9.

with the $74 million Q1 2015 revenue estimate in light of the sales information he had seen. On January 5, 2015, Greenquist stated that "I'm not confident that we can re-affirm 1Q. . . . 4Q has shaken my confidence in anything that Sales tells me."[15]

45.    According to the SEC Order, despite his concerns, Greenquist pushed to include a statement about Q1 2015 revenue in the press release because he had previously affirmed the Company's comfort with the $74 million estimate during the October 23, 2014 conference call. Greenquist stated that Sonus was "in a box" and agreed with the head of investor relations who wrote that "if we don't say anything, it will be an information vacuum and [investors] will assume the worst [regarding Sonus's Q1 2015 revenue]."[16]

46.    According to the SEC Order, on January 7, 2015, the results of the Q1 2015 "Snap the Line" showed a gap of approximately $11 million between the $74 million Q1 2015 revenue forecast and the deals the sales team classified as Q1 Committed Pipeline (after accounting for the Regional Vice Presidents for Sales' judgment). Greenquist was fully aware of this $11 million gap because he received weekly updates regarding Q1 2015.[17]

47.    Despite knowing that the Company's previously-stated Q1 2015 revenue forecast was unattainable, the very next day, on January 8, 2015, at 7 a.m., Sonus issued a press release, filed with the SEC one hour later, quoting Greenquist, stating that Sonus "remain[ed] comfortable with consensus analyst revenue . . . estimates for the first quarter of 2015 of approximately $74 million."

---

[15] SEC Order ¶25.
[16] SEC Order ¶26.
[17] SEC Order ¶23.

48.     According to the SEC Order, just five days later, on January 13, 2015, Greenquist made clear that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 was misleading, stating in an internal communication that "[Swade] currently doesn't have a path……at least a high probability path……to 74 in 1Q."[18]

49.     According to the SEC Order, Sonus held its Global Sales Conference January 19-22, 2015, which was attended by the Company's sales team. The sales team had continued to update the Salesforce tracking tool with current information on potential sales, and by the beginning of the conference, the gap between Q1 2015 Committed Pipeline and the Company's $74 million revenue estimate was still $10.2 million. During the conference, Swade instructed the Company's Regional Vice Presidents for Sales to cancel their scheduled team building exercises in favor of holding regional team meetings to figure out how to close the gap.[19]

50.     According to the SEC Order, at the regional sales team meetings, the sales teams were instructed to reclassify deals as Q1 Committed Pipeline in order to close the gap. As instructed, the sales teams reviewed high revenue deals that were not classified as Q1 Committed Pipeline but had the best chance of closing in Q1 2015, attempting to reclassify enough of those deals to close the gap. Many members of the sales teams objected to reclassifying these deals because they did not believe the deals were likely to close during Q1 2015 and therefore did not meet the Company's own criteria for Q1 Committed Pipeline. One Regional Vice President for Sales told his team that he agreed that some of the deals were speculative and should not be reclassified but instructed the team to do so anyway.[20]

---

[18] SEC Order ¶28.
[19] SEC Order ¶¶29-30.
[20] SEC Order ¶31.

51.     According to the SEC Order, internal emails confirm that the sales teams were instructed to improperly reclassify deals as Q1 Committed Pipeline in order to meet the $74 million target. One of the Regional Vice Presidents for Sales emailed his team to "clarify the Forecasting ask from yesterday. I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number. All I can ask is that you pull forward anything possible, and do your best." Three days later, he noted that "whether we agree with everything or not (and usually not), each of us needs to make a decision to be here or not, and then get to work."[21]

52.     According to the SEC Order, the Vice President of Global Operations also emailed one of the Regional Vice Presidents for Sales: "Great session yesterday with the team – we have the deals identified," and asked him to ensure his team updated the Salesforce data. Swade replied to that email: "Commit on behalf of your team and let them [k]now there is no other option. [Your region] has to [g]et it done."[22]

53.     The SEC Order, citing to internal communications, states that failure to lie about Q1 2015 Committed Pipeline deals would lead to termination. On March 25, 2015, a member of the sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were *fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit*."[23] (emphasis added)

54.     According to the SEC Order, due to Swade's pressure and the instructions passed down to the sales teams, approximately $12.4 million in revenue was reclassified as Q1

---

[21] SEC Order ¶32.
[22] SEC Order ¶32.
[23] SEC Order ¶32.

Committed Pipeline. Unsurprisingly, most of the reclassified deals did not close during Q1 2015. Despite the sales teams' efforts to close the reclassified deals by offering the customers large discounts, Sonus recognized less than $2.5 million in Q1 2015 revenue from the reclassified deals.[24]

55.    According to the SEC Order, after the Global Sales Conference and before the February 18, 2015 SEC filings and earnings call, Swade and other Company executives continued to review the Salesforce data and held weekly calls with the sales teams to discuss the status of the deals. During these calls, Sonus employees repeatedly warned Swade that the reclassified deals were high risk. In response to a February 2, 2015 email from Swade requesting that the Regional Vice Presidents for Sales identify "back-up" deals that could be pulled into Q1 2015 if needed, one of the Regional Vice Presidents responded that he "[didn't] have much to offer" because his team was "already pulling in deals that are Q2-4 deals (into Q1) . . . We've forecasted (and maybe even over-forecasted) some of these," and he noted that three deals would likely generate less revenue than currently forecasted.[25]

56.    According to the SEC Order, as the quarter went on, the sales teams updated the Salesforce data to reflect the current status of their potential sales, and the results proved the employees' concerns to be true. In the week before February 18, 2015, the sales teams removed approximately $5 million of deals from the Q1 Committed Pipeline, indicating that those deals were no longer expected to close during Q1 2015. Swade received a report on February 17, 2015

---

[24] SEC Order ¶33.
[25] SEC Order ¶34.

reflecting this decline. Other Sonus senior executives also learned of this drop through reports they received during the week leading up to February 18, 2015.[26]

57.    According to the SEC Order, the Company's senior executives relied on Swade to maintain the accuracy of the Salesforce data and provide an opinion on the Company's sales outlook for the quarter. Swade confirmed to the Company's senior executives that $74 million was a reasonable estimate for Q1 2015 revenue, despite knowing of the eight-digit gap between the Q1 2015 Committed Pipeline and the estimate. When he confirmed the Q1 2015 estimate, Swade knew that the $74 million guidance for Q1 2015 revenue was materially misleading.[27]

58.    On February 18, 2015, the Company issued a press release announcing its financial results for the fourth quarter of 2014, which was filed as an exhibit to a Form 8-K filed with the SEC. In the press release, issued a mere five weeks prior to the close of Q1 2015, the Company reiterated its previous revenue forecast for Q1 2015 of $74 million.

59.    Also on February 18, 2015, the Company held an Earnings Conference Call to discuss the financial results for Q4 2014. During the earnings call, Defendant Greenquist stated, with respect to revenue guidance for Q1 2015, that "looking at Q1, we expect revenue to be approximately $74 million."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

60.    On January 8, 2015, at 7:00am, Sonus issued a press release, filed as an exhibit to a Form 8-K filed with the SEC on the same date, regarding an asset acquisition, the terms of a reverse stock split, and preliminary financial results for Q4 2014. The press release quoted

---

[26] SEC Order ¶35.
[27] SEC Order ¶38.

Greenquist stating "we remain comfortable with consensus analyst revenue . . . estimates for the first quarter of 2015 of approximately $74 million."

61.    Defendants' reaffirmation on January 8, 2015 of their earlier October 23, 2014 expression of comfort with a Q1 2015 revenue forecast of $74 million was materially false and misleading because Defendants knew the following:

(a)    Sonus had complete visibility into its Q1 2015 revenues prior to its January 8, 2015 statement because all customer commitments for Q1 2015 were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)    Sonus included sales personnel's "stretch numbers" as "commit numbers" in the Q1 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)    Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue

forecast would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)     Before Defendants reaffirmed the Q1 2015 revenue forecast on January 8, 2015, Sonus knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and that they expressed specific concern that they could not confirm that AT&T, Sonus's largest customer, would purchase during Q1 2015. This information was reported to Defendants.

(e)     According to the SEC Order, Defendants knew that a number of deals originally projected to close in Q1 2015 had already been "pulled forward" into Q4 2014. Approximately 39% of Sonus's Q4 2014 sales revenue was from deals pulled forward from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f)     According to the SEC Order, Defendants knew that Sonus's backlog at the beginning of Q1 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low backlog *prior to* January 8, 2015. In fact, Sonus began Q1 2015 with 62% less backlog than the beginning of Q1 2014.

(g)     According to the SEC Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in

an email that $66 million was a more reasonable number for Q1 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk. ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)    According to the SEC Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with the $74 million Q1 2015 revenue estimate, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q. ... 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's Q1 2015 Committed Pipeline because he received weekly updates regarding Q1 2015.

(i)    According to the SEC Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline in an attempt to close the gap between the "commit numbers" and the revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)    According to the SEC Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales teams

to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

62.    On February 18, 2015, the Company issued a press release announcing its financial results for the fourth quarter of 2014, which was filed as an exhibit to a Form 8-K filed with the SEC. In the press release, issued a mere five weeks prior to the close of Q1 2015, the Company issued a revenue forecast for Q1 2015 of $74 million.

63.    Also on February 18, 2015, the Company held an Earnings Conference Call to discuss the financial results for Q4 2014. During this conference call, Defendant Greenquist repeated the Company's revenue guidance for Q1 2015, stating "Now, looking at Q1, we expect revenue to be approximately $74 million." Defendant Greenquist further stated during the call that "our first quarter is more backend loaded than the past few years but the revenue is also far more diversified. In short, we're not dependent upon a single large deal in the quarter. Instead, we have a number of good sized deals in our funnel that we expect to close over the next few weeks."

64.    Defendants' February 18, 2015 forecast of $74 million in Q1 2015 revenue for Sonus was materially false and misleading because Defendants knew the following:

(a)    Sonus had complete visibility into its Q1 2015 revenues prior to the February 18, 2015 forecast because all customer commitments for Q1 2015 were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)    Sonus included sales personnel's "stretch numbers" as "commit numbers" in the Q1 2015 revenue projection. Defendants knew that these "stretch numbers" included

potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)    Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)    Before Defendants stated the Q1 2015 revenue forecast on February 18, 2015, Sonus knew that senior sales personnel were expressing in weekly meetings that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and that they expressed specific concern that they could not confirm that AT&T, Sonus's largest customer, would purchase during Q1 2015. This information was reported to Defendants.

(e)    According to the SEC Order, Defendants knew that a number of deals originally projected to close in Q1 2015 had already been "pulled forward" into Q4 2014. Approximately 39% of Sonus's Q4 2014 sales revenue was from deals pulled forward

from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f)     According to the SEC Order, Defendants knew that Sonus's backlog at the beginning of Q1 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low backlog *prior to* January 8, 2015. In fact, Sonus began Q1 2015 with 62% less backlog than the beginning of Q1 2014.

(g)     According to the SEC Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in an email that $66 million was a more reasonable number for Q1 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk. ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)     According to the SEC Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with the $74 million Q1 2015 revenue estimate, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q. ... 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's Q1 2015 Committed Pipeline because he received weekly updates regarding Q1 2015. On January 13, 2015, Greenquist made clear that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 had been a lie, stating in an internal communication that

"[Swade] currently doesn't have a path……at least a high probability path……to 74 in 1Q."

(i)    According to the SEC Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline in an attempt to close the gap between the "commit numbers" and the revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)    According to the SEC Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales teams to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

(k)    According to the SEC Order, the sales teams removed approximately $5 million of deals from the Q1 Committed Pipeline in the week before February 18, 2015. Defendants knew of this drop through reports they received during that week.

65.    Defendants included or incorporated by reference certain risk disclosures related to its revenue forecast for the first quarter of 2015. At the commencement of the February 18, 2015 Earnings Conference Call, Sonus's vice president of investor relations, Patti Leahy, stated:

As shown on slide 2, please note that during this call, we will make forward-looking statements regarding items such as future market opportunities and the company's financial outlook. Actual events or financial results may differ materially from these forward-looking statements and are subject to various risks and uncertainties including without limitation, economic conditions, market acceptance of our products and services, the timing of revenue recognition, difficulties leveraging market opportunities, the impact of restructuring activities, and our ability to realize the benefits of acquisition.

A discussion of these and other factors that may affect future results is contained in our most recent Form 10-Q filed with the SEC and in today's earnings release, both of which are available on our web site. While we may elect to update or revise forward-looking statements at some point, we specifically disclaim any obligation to do so.

66.     The foregoing risk disclosures were materially false and misleading, and, therefore, not meaningful, because Defendants knew but failed to disclose that:

(a)     Sonus had complete visibility into its Q1 2015 revenues prior to the January 8, 2015 and February 18, 2015 forecasts because all customer commitments for Q1 2015 were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the Q1 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)    Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)    Before Defendants reiterated the Q1 2015 revenue forecast on January 8, 2015 and February 18, 2015, Sonus knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that the Q1 2015 sales forecast would be reached, that "sales weren't looking good," and that they expressed specific concern that they could not confirm that AT&T, Sonus's largest customer, would purchase during Q1 2015. This information was reported to Defendants.

(e)    According to the SEC Order, Defendants knew that a number of deals originally projected to close in Q1 2015 had already been "pulled forward" into Q4 2014. Approximately 39% of Sonus's Q4 2014 sales revenue was from deals pulled forward from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f)    According to the SEC Order, Defendants knew that Sonus's backlog at the beginning of Q1 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low

backlog *prior to* January 8, 2015. In fact, Sonus began Q1 2015 with 62% less backlog than the beginning of Q1 2014.

(g)    According to the SEC Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in an email that $66 million was a more reasonable number for Q1 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk. ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)    According to the SEC Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with the $74 million Q1 2015 revenue estimate, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q. ... 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's Q1 2015 Committed Pipeline because he received weekly updates regarding Q1 2015. On January 13, 2015, Greenquist made clear that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 had been a lie, stating in an internal communication that "[Swade] currently doesn't have a path……at least a high probability path……to 74 in 1Q."

(i)    According to the SEC Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline in an attempt to close the gap between the "commit numbers" and the

revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)     According to the SEC Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales teams to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

(k)     According to the SEC Order, the sales teams removed approximately $5 million of deals from the Q1 Committed Pipeline in the week before February 18, 2015. Defendants knew of this drop through reports they received during that week.

(l)     Defendants knew that this general risk factor had already materialized, that actual financial results would "differ materially" from the Q1 2015 forecast, and that Sonus would not achieve $74 million in sales in Q1 2015. Defendants were duty bound, but failed, to disclose that the specific adverse event the Company was warning of hypothetically had already transpired, rendering the foregoing risk disclosure false and misleading.

### THE TRUTH IS REVEALED

67.     Following the February 18, 2015 SEC filings and earnings call, and before March 24, 2015, the sales force removed $20 million in revenue from the Q1 Committed Pipeline.[28]

68.     On March 24, 2015, before the market opened, the Company issued a press release entitled "Sonus Updates Guidance and Initiates Cost Reduction Review." The press release revealed the devastating Q1 2015 revenue shortfall. Instead of the $74 million projection, the Company expected revenue of only $47-$50 million, and instead of a 0.03 cent gain in non-GAAP EPS, investors would now suffer a 0.29-0.34 cent loss in non-GAAP EPS.

69.     The press release also announced that the Company would "initiate a company-wide review of its cost structure," i.e., Sonus intended to fire a significant number of employees.

70.     The press release offered scant explanation for the $24 million miss, stating that "the Company no longer expects to receive certain orders this quarter that had been expected to be received at the back end of the first quarter."

71.     On this news, shares of Sonus plummeted $4.46 per share, from $13.16 to $8.70 per share, a loss of over 33%, damaging investors.

72.     On April 22, 2015, during the first quarter, 2015, Earnings Conference Call, Dolan and Greenquist explained the reasons for the revenue forecast miss. In doing so, they contradicted their own previous statements, ignored information of which they were aware, and stated as new information that which they knew as fact months earlier.

73.     Defendants expressed surprise that customers had "longer sales cycles," and blamed this phenomenon for part of the missed forecast. Their "surprise" was disingenuous, since,

---

[28] SEC Order ¶39.

as far back as July 2014, defendants had acknowledged the shift to longer decision cycles while explaining the delayed 2014 deal that they then hoped would come to fruition in 2015. Further, sales personnel were aware of longer decision cycles in 2014, and as the CEO and CFO had at least once-weekly meetings with the Vice President of Sales, Defendants Dolan and Greenquist were also aware of the trend.

74.    Dolan feigned further "surprise" that "the vast majority of those late quarter deals [referenced in the February reiteration of the forecast] didn't occur." Dolan noted that certain customers' Q1 purchases were "a fraction of what we forecast," completely ignoring the irresponsibility that went into the missed forecast, all of which can be laid at Sonus's feet. As internal documents cited in the SEC Order confirm, Defendants knew that the $74 million Q1 2015 revenue forecast was a lie. It was Sonus's arrogance that led it to substitute "stretch numbers" in place of "commit numbers" in formulating their forecast. Defendants knew that "stretch numbers" were not reachable, their employees told them the numbers were unrealistic, they fired senior sales personnel who refused to go along with the switch, and thus Dolan and Greenquist knew that their forecast was materially false when they issued it on January 8, 2015, and on February 18, 2015.

75.    Dolan also admitted that expected 2015 revenue from AT&T would be $35 million less than predicted – $20 million instead of $55 million. Neither Dolan nor Greenquist mentioned that their sales people had warned them long before both January 8, 2015 and February 18, 2015 that they could not confirm that AT&T would commit to any purchases in Q1 2015.

76.    Dolan and Greenquist completely ignored the most obvious proof that they knew they would never achieve their revenue forecast, namely that before the Q1 2015 revenue forecast

on January 8, 2015 and February 18, 2015, senior sales personnel were expressing, in weekly meetings, that they did not believe that the sales forecast would be reached and that Salesforce documented a revenue shortfall in Committed Pipeline deals of over $10 million. Sonus had complete visibility that its January 8, 2015, and February 18, 2015 forecasts for Q1 2015 would not be reached, and that any statement of that forecast would be false.

77.     Finally, the Sonus executives blamed their sales personnel for the missed projection, stating that since the announcement of the revenue miss, executives had "done a lot of work... in our interactions with customers," implying that they were not previously familiar with their customers' trends and expected purchases. This implication was patently false. Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company well before the January 8, 2015 and February 18, 2015 revenue forecasts, those same sales personnel had correctly warned them that their projections were not reachable, senior sales personnel had expressed that they would not reach the $74 million forecast, and Dolan himself regularly visited with, and closed deals with, Sonus's customers well before the initial revenue forecast on October 23, 2014, and the reaffirmation of that revenue forecast on January 8, 2015 and February 18, 2015.

78.     Further, Defendants had pressured sales personnel, at the risk of losing their jobs, with adding Committed Pipeline deals to Q1 2015's sales projections which both Defendants and the sales personnel knew could and would not be recognized in Q1 2015.

79.     During the conference call, Greenquist announced that Sonus would fire 12.5% of its workforce.

80.     Industry analysts reacted harshly to Sonus's announcement of its missed revenue target. William Blair analyst Dmitri Netis, in a March 24, 2015 report, called "the magnitude of the miss shocking," and slammed Sonus's management, calling it "unresponsive. He suggested that Sonus's management "skate to the penalty box." William Blair lowered Sonus's stock rating from "Outperform" to "Market Perform."

81.     On March 25, analyst Cowen and Company expressed similar displeasure with Sonus's lack of forthrightness, expressing displeasure that "management provided no explanation for the reduced guidance."

82.     On August 7, 2018, the SEC issued a press release and the SEC Order stating that the SEC had charged Ribbon Communications, Inc. (the corporate successor to Sonus), Greenquist, and Swade with making material misstatements on both January 8, 2015 and on February 18, 2015 concerning Sonus's quarterly revenue estimates and guidance for Q1 2015. The Company, Greenquist, and Swade settled the charges, and agreed to pay civil penalties totaling $1.97 million. The SEC found that Sonus, Greenquist, and Swade had violated Section 17(a)(2) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 promulgated thereunder, and ordered that Sonus, Greenquist and Swade cease and desist from committing or causing any violations and any future violations.

## NO SAFE HARBOR

83.     Sonus's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form

8-K, they are excluded from the protection of the statutory Safe Harbor. **See** 15 U.S.C. §78u-5(b)(2)(A).

84.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Sonus who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

85.    The market for Sonus securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Sonus securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Sonus securities relying upon the integrity of the market price of Sonus securities and market information relating to Sonus, and have been damaged thereby.

86.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sonus securities and operated as a fraud or deceit on Class Period purchasers of Sonus securities by misrepresenting the value of the Company's business and prospects by

providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Sonus securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Sonus securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, **i.e.,** damages, under the federal securities laws.

87.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Sonus's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Sonus and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Sonus securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Sonus securities was removed and the price of Sonus securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

88.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Sonus securities during the Class Period that suffered compensable damages related to the securities violations

alleged herein (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sonus securities and other publicly-traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sonus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sonus;

(c)     whether the Individual Defendants caused Sonus to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly in issuing false and misleading financial statements;

(e)     whether the prices of Sonus securities were artificially inflated during the Class Period because of the conduct of Defendants complained of herein; and

(f)     whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

94.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Sonus's securities are traded in an efficient market;

(d)    The Company traded on NASDAQ, and was covered by multiple analysts;

(e)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(f)    Plaintiff and other members of the Class purchased and/or sold Sonus securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

95.    As a result of the foregoing, the market for Sonus's common stock promptly digested current information regarding Sonus from all publicly available sources and reflected such information in Sonus's stock price. Under these circumstances, all purchasers of Sonus's common stock during the Class Period suffered similar injury through their purchase of Sonus's common stock at artificially inflated prices, and a presumption of reliance applies.

96.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

97.    Alternatively, Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972) as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5 Promulgated
### Thereunder Against Defendants Sonus and Greenquist

98.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Sonus securities during the Class Period.

101.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonus securities. Plaintiff and the Class would not have purchased Sonus securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

102.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.    The Individual Defendants acted as controlling persons of Sonus within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Sonus securities, the Individual Defendants had the power and authority to cause Sonus to engage in the wrongful conduct complained of herein. Sonus controlled the Individual Defendants and all of the Company's employees.

104.    By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

4

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: November 8, 2018                    By:   _/s/ Daryl Andrews_____

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO# 122010)
Daryl Andrews (BBO# 658523)
265 Franklin Street, Suite 1702
Boston, MA 02110
617-936-2796
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com


**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

*Attorneys for Plaintiff*

4