## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RON MILLER, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>    vs.<br><br>SONUS NETWORKS, INC., RAYMOND P. DOLAN, MARK T. GREENQUIST, AND MICHAEL SWADE,<br><br>        Defendants. | Civil Action No.: 18-12344-GAO<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiffs Guiseppe Veleno and Gary Williams, and Named Plaintiff Ron Miller (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sonus Networks, Inc. ("Sonus" or "Company"), Company press releases, media and reports about the Company, interviews with former employees, and the SEC's August 7, 2018 "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order" in the administrative proceeding styled *In re Ribbon Commc'ns Inc., et al.*, File No. 3-18624. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of Sonus[1] during the period of January 8, 2015 and March 24, 2015, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class"). On behalf of themselves and the Class, Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who issued knowingly false statements during the Class Period.

2.      Sonus provides communication solutions that allow businesses large and small to secure their communications infrastructures. Sonus's early products were hardware-based. As newer, cloud-based software solutions proliferated, however, Sonus fell behind its competitors. In addition, longer purchasing decision cycles exacerbated the Company's troubles, as revenue expected in a particular quarter was pushed into the future, and often reduced.

3.      In July 2014, Sonus hired Michael Swade, and he assumed the role of Vice President of Worldwide Sales in September 2014. Upon ascending to his new title, Swade changed the way Sonus forecasted revenue. Where before the Company had included in its revenue forecast each salesperson's "commit number," a conservative estimate of total sales from that employee in a

---

[1] On October 30, 2017 Sonus announced the completion of its merger with GENBAND US LLC, each becoming a wholly owned subsidiary of a parent company named "Sonus Networks, Inc." Sonus began conducting business as "Ribbon Communications, Inc." ("Ribbon"), and its NASDAQ ticker symbol was changed from "SONS" to "RBBN."

particular time period, rather than their "stretch number," an aspirational figure rarely reached, Swade now demanded that sales employees use "stretch numbers" as their minimum target.

4.      On October 23, 2014, Sonus included those "stretch numbers" in its forecast for the first time, projecting $74 million in revenue in the first quarter of 2015 ("First Quarter 2015"). Concurrently, senior sales personnel were informing their superiors in weekly meetings, relayed to Defendants Raymond P. Dolan and CFO Mark T. Greenquist, that the Company would not reach $74 million in revenue in First Quarter 2015.

5.      Internal Company communications show that Defendants were aware, before January 1, 2015 that the Company would not achieve $74 million in revenue during First Quarter 2015. Rather, Defendants included in their First Quarter 2015 revenue forecast amounts from deals that the Company had forced sales personnel to list as attainable but that were "fictitious"—having no chance of closing during First Quarter 2015. Indeed, Defendants threatened to fire sales personnel who refused to categorize unattainable deals as "commit" numbers and, in fact, fired one employee for refusing.

6.      Nevertheless, on January 8, 2015, Sonus reaffirmed its comfort with analysts' consensus estimate of $74 million in revenue in First Quarter 2015. On February 18, 2015, confirming analysts' consensus estimate, Sonus itself projected $74 million in revenue for First Quarter 2015.

7.      As they reaffirmed their comfort with analysts' consensus estimate and then adopted that consensus estimate as their own, Defendants knew that the Company would fall materially short of the $74 million revenue forecast. Defendants knew that the unrealistic "stretch numbers" remained aspirational and largely unreachable, a fact that senior sales personnel regularly

communicated to Defendants. Defendants also knew that a number of 2015 sales had been "pulled forward" to buoy sales numbers in Q4 2014, at management's express direction, and that the "backlog" of sales expected to be recognized in early 2015 was significantly lower than usual. As First Quarter 2015 progressed, Defendants received continuing updates confirming that the Company would fall materially short of its sales revenue forecast. All these facts are proven by internal, contemporaneous Sonus communications Sonus produced to the SEC.

8.      Sonus could not avoid the reckoning it put off about its knowingly false revenue forecasts. On March 24, 2015, Sonus was forced to reveal its dismal First Quarter 2015 results. The Company had missed its forecast by a massive amount, taking in only $50 million in revenue, failing to close deals they had told investors they expected to close.

9.      The market reacted immediately to the $24 million revenue miss. The price of Sonus's stock plummeted $4.46 per share, from $13.16 to $8.70 per share, a loss of over 33%, causing damage to investors.

10.      On August 7, 2018, the SEC disclosed both the administrative proceeding styled *In re Ribbon Commc'ns Inc., et al.*, File No. 3-18624 and that it had issued an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order" press release and order ("Cease-and-Desist Order").[2] The Cease-and-Desist Order stated that the SEC had charged Ribbon, Greenquist, and Swade with making material misstatements on January 8, 2015 and February 18, 2015, concerning Sonus's quarterly revenue

---

[2] Plaintiffs attach the Cease-and-Desist Order hereto as Exhibit A, incorporating it herein by reference in its entirety.

estimates and guidance for First Quarter 2015. Defendants Sonus, Greenquist, and Swade consented to entry of the Cease-and-Desist Order, agreeing, without admitting liability, to pay civil penalties totaling $1.97 million to settle the charges.

11.     The Cease-and-Desist Order revealed publicly for the first time detailed descriptions of numerous internal Sonus communications, supporting, with particularity, that Defendants Greenquist and Swade knew that First Quarter 2015 revenues would fall materially short of the forecast *before* Defendants stated and affirmed that forecast on both January 8, 2015 and February 18, 2015. That is, as they uttered it, Defendants knew that no reasonable basis existed for the Company's First Quarter 2015 revenue forecast.

12.     Three months after the Cease-and-Desist Order, on November 8, 2018, Plaintiff Miller filed the complaint in this case.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. Defendant Sonus maintains its headquarters and conducts business in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiffs Guiseppe Veleno and Gary Williams, as set forth in the certifications filed with their motion for appointment as Lead Plaintiffs, ECF No. 13-2, purchased Sonus securities during the Class Period and have been damaged thereby.

18.     Named Plaintiff Ron Miller, as set forth in the certification filed with the original complaint in this action, ECF No. 1, purchased Sonus securities during the Class Period and has been damaged thereby.

19.     Defendant Sonus, n/k/a Ribbon Communications, Inc., is a Delaware corporation headquartered in Westford, Massachusetts. Sonus provides networked solutions from communications service providers and enterprises, bringing intelligence and security to real-time communications. The Company's common stock was listed on the NASDAQ, an efficient market, under the ticker symbol "SONS" until late 2017 when it changed to "RBBN."

20.     Defendant Raymond P. Dolan ("Dolan") was Sonus's Chief Executive Officer ("CEO") and President throughout the Class Period, from October 2010 through December 2017.

21.     Defendant Mark Greenquist ("Greenquist") was Sonus's Chief Financial Officer ("CFO") throughout the Class Period, from November 2013 through June 2016.

22.     Defendant Michael Swade ("Swade") was hired by Sonus in July 2014 and held the title of Vice President of Worldwide Sales and Marketing for Sonus from September 2014 and throughout the Class Period.

23.     Defendants Dolan, Greenquist, and Swade are collectively referred to herein as the "Individual Defendants." Sonus and the Individual Defendants are collectively referred to herein as "Defendants."

24.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

25.     As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect

to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

26.     Sonus is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

27.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sonus under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Sonus's communication solutions allow service providers and enterprises to protect and secure their communications infrastructures by providing 4G/LTE solutions, including Voice over Internet Protocol ("VoIP"), video, instant messaging and online collaboration. Sonus's first products allowed these providers to reduce costs and increase security by switching from the costly Public Switched Telephone Network ("PSTN") infrastructures into the more efficient Internet Protocol ("IP") based models.

29.     As IP-to-IP communications have become more common, Sonus began shifting its product line to provide cloud-based solutions to link and secure multivendor, multiprotocol communications systems and applications across their customers' networks of smartphones and tablets, for all their employees and all their offices. Sonus's product focus was on "session border controllers" ("SBCs"), which help secure connections as private communications connect with the public internet.

30.     The shift to IP-to-IP communications with the advent of wireless communications meant a switch to software-based products and solutions. Sonus has acknowledged this shift. In October 2013, Sonus introduced a software-based SBC designed with unlimited scalability and advanced features. The switch to 4G LTE networks created additional security risks and network congestion. Sonus's product focus has more recently shifted to diameter signaling controllers ("DSCs"), which interconnect separate elements and create a central point of control. DSCs are the fastest-growing segment of its business, though not the largest.

31.     Sonus sells its products through a global direct sales force, with additional sales support from regional channel partners throughout the world.

32.     In 2012, Sonus launched an expanded channel partner program, the "Sonus Partner Assure Program," to expand its coverage of the service provider and enterprise markets.

33.     The shift from hardware to software created indecision on the part of Sonus's customers and hurt Sonus's business. A former employee ("FE1") who worked as an Inside Sales and Business Operations Representative in Sonus's Westford, Massachusetts headquarters from November 2007 to October 2014,[3] stated that as Sonus's competitors rolled out new cloud-based solutions, Sonus's hardware-based products were behind the times, and they lost customers. By late 2014, Sonus was losing customers "quarter after quarter."

34.     Further, customers were shifting to longer decision cycles, according to FE1. During the Q2 2014 Earnings Conference Call on July 30, 2014, Defendant Dolan confirmed this, acknowledging that "a large order recently expected to score this year is now likely to score in

---

[3] FE1 reported to Matt Dillon, Senior VP of Global Services. Dillon reported to CEO Richard Nottenburg, and later to Nottenburg's replacement, Defendant Dolan.

2015." Defendant Greenquist elaborated on the longer cycles, stating with respect to the same delayed order that "it will be tough to say whether it's going to happen in a single quarter, next year or whether it's going to be multiple quarters." Magnifying Sonus's knowledge that sales cycles were longer, months later, during the Q3 2014 Earnings Conference Call on October 23, 2014, Dolan admitted that there was no certainty that the same order would even come in in 2015, stating "we still ***think*** that will happen in 2015, but not exactly sure in what quarter."

35.     On October 23, 2014, during the Q3 2014 Earnings Conference Call, Sonus issued a projected revenue forecast for First Quarter 2015, with Defendant Greenquist stating that "we are also comfortable with the current consensus estimates for the first quarter of next year of $74 million in revenue …."

### Sonus Used Salesforce Data to Prepare Quarterly Revenue Guidance

36.     Sonus used a software program called "Salesforce" to track sales and update forecasts on a constant basis. According to a former employee ("FE2"),[4] an Enterprise Account Manager headquartered in Dallas, Texas, from May 2013 to January 2015, sales employees entered information into the system daily, including information concerning deals that were not going to close. Defendants Dolan and Greenquist had unfettered access to Salesforce data and reports. Another former employee ("FE3"), who was a Senior Director of Communications Channel in

---

[4] FE2 reported to FE6, VP of Enterprise for the Americas. With respect to "Enterprise" business, in its Annual Report on Form 10-K for the year ended December 31, 2014 the Company stated, "Enterprise customers and target enterprise customers include financial institutions, retailers, state and local governments, and other multinational corporations." In 2014, Enterprise customers accounted for approximately 19% of Sonus's total produce revenue and nearly 12% of total revenue.

California from 2011 to 2013,[5] confirmed Dolan's and Greenquist's unfettered access to Salesforce database and reports. Yet another former employee ("FE4"), a Senior Channel Account Manager for Sonus Networks in Kansas from January 2013 to January 2015,[6] recalled that Enterprise employees were rigorous about updating daily prospects and active accounts into the Salesforce database.

37.     According to the Cease-and-Desist Order,[7] Sonus's sales team was required to input detailed information about potential sales opportunities into the Salesforce program, including estimated revenue and closing date. The sales team was also required to populate a field called "Forecast Category."[8] Forecast Category indicated the salesperson's judgment as to whether the deal would close in the relevant quarter. Guidelines provided to the sales team described the three Forecast Categories:

> (1)     "Committed Pipeline" – indicating that the deal "will be won and booked in the quarter identified";
>
> (2)     "Upside" – indicating that the deal was "not in commit because highly competitive or timing of [the purchase order] at risk for the quarter identified"; and

---

[5] FE3 reported to Joe McLaughlin, VP of Global Channels, who reported to Senior Vice President of Worldwide Sales Todd Abbott.

[6] FE4 reported to Joe McLaughlin, VP of Global Channels. McLaughlin reported to Vice President of Sales Todd Abbott. After Abbott left Sonus in October 2014, McLaughlin reported to his replacement, Michael Swade.

[7] Citations to the Cease-and-Desist Order are designated "Cease-and-Desist Order ¶__."

[8] Cease-and-Desist Order, ¶21.

(3)   "Uncommitted Pipeline" – indicating that the deal was "[n]ot in commit because early stage deal."[9]

38.   According to the Cease-and-Desist Order, when preparing its quarterly revenue guidance, Sonus historically relied on the revenue forecasted as "Committed Pipeline," adjusted in accordance with the Regional Vice Presidents for Sales' judgment.[10]

39.   According to the Cease-and-Desist Order, Sonus directed its sales team to "Snap the Line" by the end of the first week of each quarter. "Snap the Line" meant updating the Salesforce database with current forecasts for potential sales for that quarter. Management would measure the sales team's performance against that forecast at the end of the quarter. For First Quarter 2015, the deadline for "Snap the Line" was January 7, 2015.[11]

40.   FE3 recalls that Sonus sales personnel were in daily contact with larger customers. FE2 recalls maintaining daily contact with the Sonus customers she serviced.

41.   According to FE1, Defendant Dolan was intimately involved in contract negotiations with Enterprise customers, regularly stepping in to help renew contracts with Enterprise accounts. FE3 corroborated this, recalling that Defendant Dolan visited large Enterprise customers. Indeed, FE2 recalls Defendant Dolan accompanying her to sales meetings with customers to assist in closing Enterprise deals.

---

[9] *Id.*

[10] Cease-and-Desist Order, ¶22.

[11] Cease-and-Desist Order, ¶23 & n. 7.

42.     FE3 further stated that Defendant Dolan was intimately involved in contract negotiations with Sonus's largest communications service provider customers such as AT&T, Verizon, and Level 3.[12]

43.     According to another former employee ("FE5"), a Proposal Manager in the Westford, Massachusetts company headquarters from December 2013 to March 2015, Defendants Dolan and Greenquist were intimately involved in monitoring Sonus's sales and the details and progress thereof.

44.     FE1 recalls that Defendant Dolan led quarterly meetings where he discussed contract renewals and sales progress. FE6, a former Sonus employee, who was the Vice President of Enterprise Sales in the Americas from December 2012 to December 2014, working from a Boston, Massachusetts office,[13] recalls that Sales Vice Presidents held a weekly meeting with the Senior Vice President of Worldwide Sales, who, in turn, apprised Defendant Dolan of details of the discussion at every meeting. According to FE3, the Vice President of Worldwide Sales and Defendant Dolan met at least once weekly.

45.     According to FE3, at the start of each year, Sonus compiled a revenue forecast. Each member of a sales team had to forecast their sales for the year. Each sales member submitted two numbers - a "commit number," which management expected the employee to reach, and a higher "stretch number," considered a best case scenario, and unlikely to be reached. Sonus based sales targets and revenue forecasts on the "commit numbers." According to FE3, sales personnel submitted weekly reports indicating whether they were on track to meet their "commit number."

---

[12] Historically, Sonus's largest customer has been AT&T, accounting for approximately 19% of its revenue in 2014, and 15% of its revenue in 2013.

[13] FE6 reported directly to Todd Abbott, Senior Vice President of Worldwide Sales.

FE3 states that Defendants Dolan and Greenquist had access to all of the information used to make projections, and that the Vice president of Worldwide Sales updated both Defendants Dolan and Greenquist at least once weekly in face-to-face meetings. FE6 confirms the differences between commit numbers and stretch numbers, and that Defendants Dolan and Greenquist received at least weekly updates about these numbers.

46.     FE3 recalls that customers, including large customers such as AT&T, Verizon, and Level 3, defined their budgets for the next year by October of the previous year, including a breakdown of the quarters in which the customer would order from and pay Sonus. Customers did not typically spend beyond what they had budgeted by October. According to FE3, if customers determined to alter their contracts materially or otherwise not to renew their contracts, Defendants Dolan and Greenquist knew that "months in advance of the first quarter," and "in the worst case it would be in October." Sales personnel apprised management immediately, via email, as soon as a customer made a decision that might cause the salesperson not to reach his commit number. Indeed a former employee ("FE7") who was Sonus's Regional Sales Director for the central region from 2008 to 2013,[14] confirms that given lengthy decision cycles, once sales personnel labeled a sale to a larger customer as a "committed number," rarely would that sale ultimately not occur.

**Sonus Hires Swade and Changes Its Revenue Forecasting Policy**

47.     In July, 2014 Sonus hired Michael Swade to replace Todd Abbott, who stayed with Sonus until October 2014. Swade assumed the role of Vice President of Worldwide Sales in September 2014. FE6 recalls that Swade implemented a change in the Company's policy regarding forecasting revenue. With the knowledge of Defendants Dolan and Greenquist, Sonus began

---

[14]     FE7 reported directly to Todd Abbott, VP of Worldwide Sales.

14

including sales personnel's "stretch numbers" in their forecasts instead of the "commit numbers." Swade pressured sales vice presidents and personnel to forecast unrealistic numbers, and to include in the "commit numbers," which were included in quarterly revenue forecasts, leads that sales personnel did not expect to yield revenue in the short term and leads and deals that were unlikely to close. Swade told Sonus sales personnel to include more stretch numbers and commit numbers because the actual "commit numbers," as Sonus had defined them until Swade took over, were too low.

48.     Failure to follow Sonus's new direction to forecast as "committed pipeline" sales that would not or were unlikely to close in a particular quarter had severe consequences for the individual salesperson. Sonus fired FE6 in December 2014 for refusing to include in FE6's "commit number" for First Quarter 2015 sales that were not going to close in the quarter. FE6 recalls that other Sales Vice Presidents succumbed to the pressure and used their "stretch numbers" as their "commit numbers."

49.     FE6 recalls that during multiple weekly sales meetings in November and December of 2014, sales vice presidents raised concerns to Swade about whether Sonus would close a sale to AT&T, Sonus's largest customer. As noted above, FE6 recalls that Swade apprised Dolan and Greenquist weekly of the discussions of every sales meeting. FE5 confirms FE6's account, stating that during the weekly sales operations meetings during the fourth quarter of 2014 and the first quarter of 2015, sales personnel expressed that the Company would fail to achieve the "stretch numbers" it included in the First Quarter 2015 revenue forecast.

50.     Thus, by late 2014 Defendants had complete visibility into First Quarter 2015 revenues, as all major customer commitments had been made. Further, they knew that the First

Quarter 2015 revenue forecast included the sales team's stretch numbers, not their commit numbers, as had been Sonus's practice prior to hiring Swade. As these numbers included potential revenue to which customers had not actually committed, Defendants knew that the revenue forecast for First Quarter 2015 was materially inflated.

51.     Further, before Defendants publicly reaffirmed their comfort with analysts' consensus estimate of First Quarter 2015 revenue on January 8, 2015 and, themselves, projected $74 in First Quarter 2015 revenue on February 18, 2015, Defendants knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that Sonus would achieve the first quarter sales forecast. Specifically, in weekly meetings in January and early February 2015, the Sonus sales team expressed the specific concern that they could not confirm that AT&T, Sonus's largest customer, would commit to purchase during First Quarter 2015.

**Defendants Project $74 Million in First Quarter 2015 Revenue
Despite Knowing It Could Not Achieve its Revenue Goal**

52.     Citing internal Sonus communications, the Cease-and-Desist Order confirms the allegations of the former employees contained herein, adding material information demonstrating the Individual Defendants' *knew* that Sonus would fall materially short of reaching $74 million in First Quarter 2015 revenue.

53.     According to the Cease-and-Desist Order, to achieve its revenue guidance for Q4 2014, Sonus "pulled forward" certain sales that were initially projected to close in 2015. Sonus's salesforce offered the customers financial incentives to close the deals early, so they could recognize the revenue in Q4 2014. Approximately $18.7 million, or 39%, of Sonus's Q4 2014 product sales

revenue was generated from deals that were pulled forward from and initially forecasted to close in 2015.[15]

54.      The Cease-and-Desist Order establishes that Greenquist recognized that pulling these deals forward from First Quarter 2015 to Q4 2014 jeopardized Sonus's chances of achieving its First Quarter 2015 revenue estimate. In an internal email dated October 7, 2014, Greenquist himself stated that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable." On December 26, 2014, one of Sonus's Regional Vice Presidents for Sales emailed Swade that he would have trouble "getting [his] team to Q1 and Q2 Quota/Commit as the [majority of his] teams have drained the pool from all the Q3/4 deals."[16]

55.      The SEC found in the Cease-and-Desist Order that Sonus recognized revenue when the product was shipped, delivered to, and accepted by the customer. "Backlog" refers to expected revenue from products that had been sold but had yet to be shipped, delivered, and accepted. At the beginning of First Quarter 2015, Sonus's backlog was much lower than it was at the beginning of Q1 in previous years.[17]

56.      Greenquist, the Cease-and-Desist Order continues, received reports showing the low backlog *prior to* January 8, 2015. Sonus employees recognized that unusually low backlog created risk for achieving the Company's First Quarter 2015 revenue estimate. In November 2014, Sonus's Vice President of Global Operations drafted a plan which included increasing the First Quarter 2015 backlog from a projected $9.4 million to $15 million by "overdriving" bookings in Q4 2014 and

---

[15] Cease-and-Desist Order ¶15.

[16] Cease-and-Desist Order ¶16.

[17] Cease-and-Desist Order ¶17 & n. 5.

pulling forward deals from Q2 2015. "Overdriving" meant entering deals in Q4 2014 where customers would agree to First Quarter 2015 delivery, so the revenue would be recognized in First Quarter 2015. However, Sonus was unable to create additional backlog and it began First Quarter 2015 with only $6.5 million of backlog, approximately $10.5 million (62%) less than the $17 million in backlog in the beginning of Q1 2014.[18]

57.    Later, according to the Cease-and-Desist Order, Sonus's Vice President of Global Operations expressed concern over whether the Company would be able to achieve its First Quarter 2015 revenue estimate. On October 23, 2014, the very same day Sonus announced "comfort" with analysts' consensus estimate of $74 million in First Quarter 2015 revenue, he sent an email stating that without adding a large deal to First Quarter 2015 backlog, $66 million was a more reasonable number for First Quarter 2015 revenue. He voiced his concerns directly to Greenquist and stated in a November 17, 2014 email that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."[19]

58.    According to the Cease-and-Desist Order, in the days leading up to the January 8, 2015 press release, Greenquist, Dolan, and Sonus's head of investor relations discussed whether the Company should comment in the press release about First Quarter 2015 revenue or remain silent on the issue.[20] Greenquist specifically expressed his concern that Sonus could not reaffirm its

---

[18] Cease-and-Desist Order ¶¶17-19 & n. 6.

[19] Cease-and-Desist Order ¶20.

[20] The Cease-and-Desist Order establishes that the head of investor relations explained that it was unusual for Sonus to provide any information about quarterly revenue that early in the quarter and outside of a formal financial results conference call. Cease-and-Desist Order ¶25 n. 9.

comfort with analysts' consensus $74 million First Quarter 2015 revenue estimate in light of the sales information he had seen. On January 5, 2015, Greenquist stated that "I'm not confident that we can re-affirm 1Q ... 4Q has shaken my confidence in anything that Sales tells me."[21]

59.   The Cease-and-Desist Order further establishes that despite his concerns, Greenquist pushed to include a statement about First Quarter 2015 revenue in the January 8, 2015 press release because he had previously affirmed the Company's comfort with analysts' $74 million consensus revenue estimate during the October 23, 2014 conference call. Greenquist stated that Sonus was "in a box" and agreed with the head of investor relations, who wrote that, "if we don't say anything, it will be an information vacuum and [investors] will assume the worst [regarding Sonus's First Quarter 2015 revenue]."[22]

60.   By no later than January 7, 2015, the Cease-and-Desist Order establishes, Defendants knew that the First Quarter 2015 "Snap the Line" showed that Sonus was nearly 15% short of the $74 million estimate, as the deals the sales team classified as Q1 Committed Pipeline (after accounting for the Regional Vice Presidents for Sales' judgment) were $11 million short. Greenquist received weekly updates regarding First Quarter 2015 revenue and was thus fully aware of this $11 million gap.[23]

61.   Despite *knowing* that the Company's previously-stated First Quarter 2015 revenue forecast was unattainable, Sonus issued a press release the very next day, on January 8, 2015 at 7

---

[21] Cease-and-Desist Order ¶25.

[22] Cease-and-Desist Order ¶26.

[23] Cease-and-Desist Order ¶23.

a.m., quoting Greenquist stating that Sonus "remain[ed] comfortable with analyst revenue … estimates for the first quarter of 2015 of approximately $74 million."

62.    Just five days later, on January 13, 2015, the Cease-and-Desist Order establishes that internal documents demonstrate that Greenquist clarified internally that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 had been a lie, stating in an internal communication that "[Swade] currently doesn't have a path … at least a high probability path … to 74 in 1Q."[24]

63.    According to the Cease-and-Desist Order, Sonus held its Global Sales Conference on January 19-22, 2015. The Company's sales team attended. The sales team had continued to update the Salesforce tracking tool with information on potential sales, and by the beginning of the conference the gap between First Quarter 2015 Committed Pipeline and the Company's $74 million revenue estimate was still $10.2 million. During the conference, Swade instructed the Company's Regional Vice Presidents for Sales to cancel their scheduled team building exercises in favor of holding regional team meetings to figure out how to close the gap.[25]

64.    At the regional sales team meetings, the Cease-and-Desist Order continues, the sales teams were instructed to reclassify deals as Q1 Committed Pipeline in order to close the gap. As instructed, the sales teams reviewed high revenue deals that they did not classify as Q1 Committed Pipeline, identifying the deals with the best chance of closing in First Quarter 2015. They then reclassified enough of those deals to close the gap. Many sales team members objected to reclassifying deals as Q1 Committed Pipeline because they did not believe the reclassified deals

---

[24] Cease-and-Desist Order ¶28.

[25] Cease-and-Desist Order ¶¶29-30.

were likely to close during First Quarter 2015 and none met the Company's own criteria for Q1 Committed Pipeline classification. One Regional Vice President for Sales told his team that he agreed that some of the deals were speculative and should not be reclassified but instructed the team to do so anyway.[26]

65.     Further, the Cease-and-Desist Order quotes internal Company emails confirming that senior managers instructed sales teams improperly to reclassify deals as Q1 Committed Pipeline expressly to meet the Company's $74 million target, threatening that the sales team members' continued employment was at stake. One of the Regional Vice Presidents for Sales emailed his team to "clarify the Forecasting ask from yesterday. I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number. All I can ask is that you pull forward anything possible, and do your best." Three days later, he noted that "whether we agree with everything or not (and usually not), each of us needs to make a decision to be here or not, and then get to work."[27]

66.     According to the Cease-and-Desist Order, the Vice President of Global Operations also emailed one of the Regional Vice Presidents for Sales: "Great session yesterday with the team – we have the deals identified," and asked him to ensure his team updated the Salesforce data. Swade replied to that email: "Commit on behalf of your team and let them [k]now there is no other option. [Your region] has to [g]et it done."[28]

---

[26] Cease-and-Desist Order ¶31.

[27] Cease-and-Desist Order ¶32.

[28] *Id.*

67.     The sales staff understood that failure to reclassify deals as Q1 Committed Pipeline, even though the sales personnel knew the prospective deals would not result in First Quarter 2015 revenue, would result in their firing. As noted above, Sonus promptly fired FE6 in December 2014 when FE6 refused to include sales that were not going to close in the quarter in FE6's "commit number."

68.     Once again citing internal Company communications, the Cease-and-Desist Order confirms FE6's account that failure to lie and reclassify deals as First Quarter 2015 Committed Pipeline would lead to termination. On March 25, 2015, a member of the sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were *fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit*" (emphasis added).[29]

69.     According to the Cease-and-Desist Order, due to Swade's pressure and the instructions he insisted managers pass down to their sales teams, the Company improperly reclassified approximately $12.4 million in revenue as Q1 Committed Pipeline. Unsurprisingly, few of the reclassified deals closed during First Quarter 2015. Despite the sales teams' efforts to close the reclassified deals by offering customers large discounts if they would consider purchasing equipment before they needed it, Sonus recognized less than 20% of the revenue the sales teams reclassified in First Quarter 2015.[30]

70.     After the Global Sales Conference and before the February 18, 2015 SEC filings and earnings call, the Cease-and-Desist order establishes, Swade and other Sonus executives continued

---

[29] *Id.*

[30] Cease-and-Desist Order ¶33 & n. 10.

22

to review the Salesforce data and held weekly calls with the sales teams to discuss the status of the deals. During these calls, Sonus employees repeatedly warned Swade that the reclassified deals were high risk. In response to a February 2, 2015 email from Swade requesting that the Regional Vice Presidents for Sales identify "back-up" deals that could be pulled into First Quarter 2015 if needed, one of the Regional Vice Presidents responded that he "[didn't] have much to offer" because his team was "already pulling in deals that are Q2-4 deals (into Q1) ... We've forecasted (and maybe even over-forecasted) some of these," and noted that three deals would likely generate less revenue than currently forecasted.[31]

71.     According to the Cease-and-Desist Order, as the first quarter progressed, the sales teams updated the Salesforce data. In the week before February 18, 2015, the sales teams removed deals worth approximately $5 million from the Q1 Committed Pipeline, indicating their expectation that those deals would not close during First Quarter 2015. Swade received a report on February 17, 2015 reflecting this decline. Sonus's other senior executives also learned of this drop through reports they received during the week leading up to February 18, 2015.[32]

72.     Defendants knew before their February 18, 2015 statement, according to the Cease-and-Desist Order, that even if every deal the forced the sales teams to include in Q1 Committed Pipeline closed before the end of the first quarter, Sonus would still fall materially short of its First Quarter 2015 revenue forecast.[33]

---

[31] Cease-and-Desist Order ¶34.

[32] Cease-and-Desist Order ¶35.

[33] *Id.*

73.     According to the Cease-and-Desist Order, the Company's senior executives relied on Swade to maintain the accuracy of the Salesforce data and to provide an opinion on the Company's sales outlook for the quarter. Swade confirmed to the Company's senior executives that $74 million was a reasonable estimate for First Quarter 2015 revenue, despite knowing of the eight-digit gap between the First Quarter 2015 Committed Pipeline and the estimate. The Cease-and-Desist Order revealed Swade's knowledge that Sonus would materially miss its First Quarter 2015 revenue forecast, showing that when he confirmed the First Quarter 2015 estimate, Swade knew that the $74 million guidance for First Quarter 2015 revenue was materially misleading.[34]

74.     On February 18, 2015, the Company issued a press release announcing its financial results for the fourth quarter of 2014, which was filed as an exhibit to a Form 8-K filed with the SEC. In the press release, issued a mere five weeks prior to the close of First Quarter 2015, the Company reiterated its previous revenue forecast for First Quarter 2015 of $74 million.

75.     Also on February 18, 2015, the Company held an Earnings Conference Call to discuss the financial results for Q4 2014. During the earnings call, Defendant Greenquist stated, with respect to revenue guidance for First Quarter 2015, that "looking at Q1, we expect revenue to be approximately $74 million."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

76.     On January 8, 2015, at 7:00am, Sonus issued a press release, filed as an exhibit to a Form 8-K filed with the SEC on the same date regarding an asset acquisition, the terms of a reverse stock split, and preliminary financial results for Q4 2014. The press release quoted Greenquist

---

[34] Cease-and-Desist Order ¶38.

stating "we remain comfortable with consensus analyst revenue ... estimates for the first quarter of 2015 of approximately $74 million."

77.     Defendants' January 8, 2015 reaffirmation of their October 23, 2014 expression of comfort with analysts' First Quarter 2015 revenue estimates of $74 million was materially false and misleading because Defendants knew the following:

(a)     Sonus had complete visibility into its First Quarter 2015 revenues prior to its January 8, 2015 statement because all customer commitments for First Quarter 2015 were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the First Quarter 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)     Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast

would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)     Before Defendants reaffirmed analysts' First Quarter 2015 $74 million revenue estimates on January 8, 2015, Sonus knew that senior sales personnel had expressed in weekly meetings that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and, more specifically, that they could not confirm that AT&T, Sonus's largest customer, would purchase during First Quarter 2015. Senior sales managers reported this information to Defendants.

(e)     According to the Cease-and-Desist Order, Defendants knew that a number of deals originally projected to close in First Quarter 2015 had already been "pulled forward" into Q4 2014. Approximately $18.7 million, or 39%, of Sonus's Q4 2014 product sales revenue was generated from deals that were pulled forward from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f)     According to the Cease-and-Desist Order, Defendants knew that Sonus's backlog at the beginning of First Quarter 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low backlog *prior to* January 8, 2015. In fact, Sonus began First Quarter 2015 with 62% less backlog than the beginning of Q1 2014.

(g)     According to the Cease-and-Desist Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to

hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in an email that $66 million was a more reasonable number for First Quarter 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)     According to the Cease-and-Desist Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with analysts' $74 million First Quarter 2015 consensus revenue estimates, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q ... 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's First Quarter 2015 Committed Pipeline because he received weekly updates regarding First Quarter 2015.

(i)     According to the Cease-and-Desist Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline, in an attempt to close the gap between the "commit numbers" and the revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)     According to the Cease-and-Desist Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales teams to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

(k)     According to the Cease-and-Desist Order, Defendants knew information before their January 8, 2015 statement undermining the truth of their reaffirmation of their comfort with analysts' $74 million First Quarter 2015 revenue estimates.

78.    On February 18, 2015, the Company issued a press release announcing its financial results for the fourth quarter of 2014, which was filed as an exhibit to a Form 8-K filed with the SEC. In the press release, issued a mere five weeks prior to the close of First Quarter 2015, the Company issued a revenue forecast for First Quarter 2015 of $74 million.

79.    Also on February 18, 2015, the Company held an Earnings Conference Call to discuss the financial results for Q4 2014. During this conference call, Defendant Greenquist repeated the Company's revenue guidance for First Quarter 2015, stating "Now, looking at Q1, we expect revenue to be approximately $74 million." Defendant Greenquist further stated during the call that "our first quarter is more backend loaded than the past few years but the revenue is also far more diversified. In short, we're not dependent upon a single large deal in the quarter. Instead, we have a number of good sized deals in our funnel that we expect to close over the next few weeks."

80.    Defendants' February 18, 2015 guidance of $74 million in First Quarter 2015 revenue for Sonus was materially false and misleading because Defendants knew the following:

(a)     Sonus had complete visibility into its First Quarter 2015 revenues prior to the February 18, 2015 forecast because all customer commitments for First Quarter 2015

were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the First Quarter 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)     Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)     Before Defendants stated the First Quarter 2015 revenue forecast on February 18, 2015, Sonus knew that senior sales personnel had expressed in weekly meetings that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and, more specifically, that they could not confirm that AT&T,

Sonus's largest customer, would purchase during First Quarter 2015. Senior sales managers reported this information to Defendants.

(e)     According to the Cease-and-Desist Order, Defendants knew that a number of deals originally projected to close in First Quarter 2015 had already been "pulled forward" into Q4 2014. Approximately $18.7 million, or 39%, of Sonus's Q4 2014 product sales revenue was generated from deals that were pulled forward from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f)     According to the Cease-and-Desist Order, Defendants knew that Sonus's backlog at the beginning of First Quarter 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low backlog *prior to* January 8, 2015. In fact, Sonus began First Quarter 2015 with 62% less backlog than the beginning of Q1 2014.

(g)     According to the Cease-and-Desist Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in an email that $66 million was a more reasonable number for First Quarter 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)     According to the Cease-and-Desist Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with analysts' $74 million First Quarter

2015 revenue estimates, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q … 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's First Quarter 2015 Committed Pipeline because he received weekly updates regarding First Quarter 2015. On January 13, 2015, Greenquist made clear that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 had been a lie, stating in an internal communication that "[Swade] currently doesn't have a path … at least a high probability path … to 74 in 1Q."

(i)     According to the Cease-and-Desist Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline, in an attempt to close the gap between the "commit numbers" and the revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)     According to the Cease-and-Desist Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales teams to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

(k)     According to the Cease-and-Desist Order, the sales teams removed approximately $5 million of deals from the Q1 Committed Pipeline in the week before February 18, 2015. Defendants knew of this drop through reports they received during that week.

(i)     According to the Cease-and-Desist Order, Defendants knew before their February 18, 2015 statement that even if every deal included in Q1 Committed Pipeline closed before the end of the first quarter, Sonus would still *not* meet its First Quarter 2015 revenue forecast.

81.     Defendants included or incorporated by reference certain risk disclosures related to its revenue forecast for the first quarter of 2015. At the commencement of the February 18, 2015 Earnings Conference Call, Sonus's vice president of investor relations, Patti Leahy, stated:

> As shown on slide 2, please note that during this call, we will make forward-looking statements regarding items such as future market opportunities and the company's financial outlook. Actual events or financial results may differ materially from these forward-looking statements and are subject to various risks and uncertainties including without limitation, economic conditions, market acceptance of our products and services, the timing of revenue recognition, difficulties leveraging market opportunities, the impact of restructuring activities, and our ability to realize the benefits of acquisition.
>
> A discussion of these and other factors that may affect future results is contained in our most recent Form 10-Q filed with the SEC and in today's earnings release, both of which are available on our web site. While we may elect to update or revise forward-looking statements at some point, we specifically disclaim any obligation to do so.

82.     The foregoing risk disclosures were materially false and misleading, and, therefore, not meaningful, because Defendants knew but failed to disclose that:

(a)     Sonus had complete visibility into its First Quarter 2015 revenues prior to the January 8, 2015 and February 18, 2015 forecasts because all customer commitments for First Quarter 2015 were finalized by October 2014, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact senior Sonus executives knew since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the First Quarter 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)     Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus's sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast would not be reached. Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(d)     Before Defendants reiterated the First Quarter 2015 revenue forecast on January 8, 2015 and February 18, 2015, Sonus knew that senior sales personnel had

expressed in weekly meetings that they did not believe that Sonus could attain the First Quarter 2015 sales forecast, that "sales weren't looking good," and, more specifically, that that they could not confirm that AT&T, Sonus's largest customer, would purchase during First Quarter 2015. Senior sales managers reported this information to Defendants.

(e) According to the Cease-and-Desist Order, Defendants knew that a number of deals originally projected to close in First Quarter 2015 had already been "pulled forward" into Q4 2014. Approximately $18.7 million, or 39%, of Sonus's Q4 2014 product sales revenue was generated from deals that were pulled forward from 2015. Greenquist admitted in an October 2014 email that "all this activity in 4Q will just drain the swamp in 1Q ... [I] think we're just postponing the inevitable."

(f) According to the Cease-and-Desist Order, Defendants knew that Sonus's backlog at the beginning of First Quarter 2015 was considerably lower than previous years despite the Company's attempts to "overdrive" sales from Q4 2014. Greenquist received reports showing the low backlog *prior to* January 8, 2015. In fact, Sonus began First Quarter 2015 with 62% less backlog than the beginning of Q1 2014.

(g) According to the Cease-and-Desist Order, Defendants knew of, but simply brushed aside, its senior employees' concerns that the Company could not come close to hitting its revenue forecast. In October 2014, Sonus's Vice President of Global Operations stated in an email that $66 million was a more reasonable number for First Quarter 2015 revenue. He reported that Greenquist dismissed "any objective commentary towards Q1 at $76M being high risk ... [Greenquist] said - $76 million is the number – the sales team needs to figure out how to get there – and if they can't, we have the wrong sales team."

(h)     According to the Cease-and-Desist Order, Greenquist himself admitted his concern that Sonus could not reaffirm its comfort with analysts' $74 million First Quarter 2015 revenue estimates, stating on January 5, 2015 that "I'm not confident that we can re-affirm 1Q ... 4Q has shaken my confidence in anything that Sales tells me." Greenquist also knew of the $11 million gap between the revenue forecast and the Company's First Quarter 2015 Committed Pipeline because he received weekly updates regarding First Quarter 2015. On January 13, 2015, Greenquist made clear that Sonus's expression of comfort with the $74 million revenue forecast on January 8, 2015 had been a lie, stating in an internal communication that "[Swade] currently doesn't have a path … at least a high probability path … to 74 in 1Q."

(i)     According to the Cease-and-Desist Order, Defendants knew that the Company's sales teams were instructed to improperly reclassify uncertain and unlikely deals as Q1 Committed Pipeline, in an attempt to close the gap between the "commit numbers" and the revenue forecast. As one of the Regional Vice Presidents for Sales clarified in an email to his team, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number." On March 25, 2015, a member of the Sonus sales team emailed his Regional Vice President that "the obvious answer to 'why' the commits were missed is they were fictitious commits to begin with. They put a gun to our head at the sales conference and mandated we flip to commit."

(j)     According to the Cease-and-Desist Order, Defendants continually reviewed the Salesforce data, which was continually updated, and held weekly calls with the sales

teams to discuss the status of the deals, during which the sales teams repeatedly warned Defendants that the reclassified deals were high risk.

(k)     According to the Cease-and-Desist Order, the sales teams removed approximately $5 million of deals from the Q1 Committed Pipeline in the week before February 18, 2015. Defendants knew of this drop through reports they received during that week.

(l)     According to the Cease-and-Desist Order, Defendants knew before their February 18, 2015 statement that even if every deal included in Q1 Committed Pipeline closed before the end of the first quarter, Sonus would still *not* meet its First Quarter 2015 revenue forecast.

(m)     Defendants knew that this general risk factor had already materialized, that actual financial results would "differ materially" from the First Quarter 2015 forecast, and that Sonus would not achieve $74 million in sales in First Quarter 2015. Defendants were duty bound, but failed, to disclose that the specific adverse event the Company was warning of hypothetically had already transpired, rendering the foregoing risk disclosure false and misleading.

## THE TRUTH IS REVEALED

83.     According to the Cease-and-Desist Order, following the February 18, 2015 SEC filings and earnings call, and before March 24, 2015, the sales force removed approximately $20 million in revenue from the Q1 Committed Pipeline.[35]

---

[35] Cease-and-Desist Order ¶39.

84.    On March 24, 2015, before the market opened, the Company issued a press release entitled "Sonus Updates Guidance and Initiates Cost Reduction Review." The press release revealed the devastating First Quarter 2015 revenue shortfall. Instead of the $74 million projection, the Company expected revenue of only $47-$50 million, and instead of a 0.03 cent gain in non-GAAP EPS, investors would now suffer a 0.29-0.34 cent loss in non-GAAP EPS.

85.    The press release also announced that the Company would "initiate a companywide review of its cost structure," i.e., Sonus intended to fire a significant number of employees.

86.    The press release offered scant explanation for the $24 million miss, stating that "the Company no longer expects to receive certain orders this quarter that had been expected to be received at the back end of the first quarter."

87.    On this news, shares of Sonus plummeted $4.46 per share, from $13.16 to $8.70 per share, a loss of over 33%, damaging investors.

88.    On April 22, 2015, during the first quarter, 2015, Earnings Conference Call, Dolan and Greenquist explained the reasons for the revenue forecast miss. In doing so, they contradicted their own previous statements, ignored information which they knew, and stated as new information that which they knew as fact months earlier.

89.    Defendants expressed surprise that customers had "longer sales cycles," and blamed this phenomenon for part of the missed forecast. Their "surprise" was disingenuous, since, as far back as July 2014, defendants had acknowledged the shift to longer decision cycles while explaining the delayed 2014 deal that they then hoped would come to fruition in 2015. Further, sales personnel were aware of longer decision cycles in 2014, and as the CEO and CFO had at least once-weekly meetings with the Vice President of Sales, they were also aware of the trend.

90.     Dolan feigned further "surprise" that "the vast majority of those late quarter deals [referenced in the February reiteration of the forecast] didn't occur." Dolan noted that certain customers' Q1 purchases were "a fraction of what we forecast," acting surprised even though, as internal documents cited in the Cease-and-Desist Order confirm, Defendants knew that the $74 million First Quarter 2015 revenue forecast would not be reached before both the January 8, 2015 and February 18, 2015 statements at issue here. It was Sonus's arrogance that led it to substitute "stretch numbers" in place of "commit numbers" in formulating their forecast. Defendants knew that "stretch numbers" were not reachable, their employees told them the numbers were unrealistic, they fired senior sales personnel who refused to go along with the switch, and thus Dolan and Greenquist knew that their forecast was materially false when they issued it on January 8, 2015, and on February 18, 2015.

91.     Dolan also admitted that expected 2015 revenue from AT&T would be $35 million less than predicted – $20 million instead of $55 million. Neither Dolan nor Greenquist mentioned that their sales people had warned them long before both January 8, 2015 and February 18, 2015 that they could not confirm that AT&T would commit to any purchases in First Quarter 2015.

92.     Dolan and Greenquist completely ignored that before the First Quarter 2015 revenue forecasts on January 8, 2015 and February 18, 2015, senior sales personnel had expressed in weekly meetings that they did not believe that the sales forecast would be reached, and that Salesforce documented a revenue shortfall in Committed Pipeline deals of over $10 million. Sonus had complete visibility that its January 8, 2015, and February 18, 2015 forecasts for First Quarter 2015 would not be reached, and that any statement of that forecast would be false.

93.     Finally, the Sonus executives blamed their sales personnel for the missed projection, stating that since the announcement of the revenue miss, executives had "done a lot of work ... in our interactions with customers," implying that they were not previously familiar with their customers' trends and expected purchases. This implication was patently false. Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company well before the January 8, 2015 and February 18, 2015 revenue forecasts, those same sales personnel had correctly warned them that their projections were not reachable, senior sales personnel had expressed that they would not reach the $74 million forecast, and Dolan himself regularly visited with, and closed deals with, Sonus's customers well before Defendants' October 23, 2014 expression of comfort with analysts' $74 million revenue estimates and their reaffirmation of that comfort on January 8, 2015 and their adoption of those estimates on February 18, 2015.

94.     Further, Defendants had pressured sales personnel, at the risk of losing their jobs, to add Committed Pipeline deals to First Quarter 2015's sales projections which both Defendants and the sales personnel knew could and would not be recognized in First Quarter 2015. FE6 was fired for refusing to do so.

95.     During the conference call, Greenquist announced that Sonus would fire 12.5% of its workforce.

96.     Industry analysts reacted harshly to Sonus's announcement of its missed revenue target. William Blair analyst Dmitri Netis, in a March 24, 2015 report, called "the magnitude of the miss shocking," and slammed Sonus's management, calling it "unresponsive. He suggested that Sonus's management "skate to the penalty box." William Blair lowered Sonus's stock rating from "Outperform" to "Market Perform."

97.     On March 25, analyst Cowen and Company expressed similar displeasure with Sonus's lack of forthrightness, expressing displeasure that "management provided no explanation for the reduced guidance."

98.     On August 7, 2018, the SEC issued a press release and the Cease-and-Desist Order stating that the SEC had charged Ribbon, Greenquist, and Swade with making material misstatements on both January 8, 2015 and on February 18, 2015 concerning Sonus's quarterly revenue estimates and guidance for First Quarter 2015. The Company, Greenquist, and Swade settled the charges, and agreed to pay civil penalties totaling $1.97 million. The SEC found that Sonus, Greenquist, and Swade had violated Section 17(a)(2) of the Securities Act, and Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 promulgated thereunder, and ordered that Sonus, Greenquist and Swade cease and desist from committing or causing any violations and any future violations.

99.     The allegations of the former Employees included herein prove Defendants' recklessness in affirming the First Quarter 2015 revenue forecast on both January 8, 2015, and February 18, 2015. The August 7, 2018 Cease-and-Desist Order, and specifically the internal Sonus communications which Sonus produced to the SEC, but which were unavailable to investors, proved that Defendants knowledge before their statements on January 8, 2015 and February 18, 2015 that Sonus would fall materially short of reaching their First Quarter 2015 revenue forecast, and knowingly lied to the public.

100.    Plaintiffs did not discover, and a reasonably diligent plaintiff would not have discovered, facts sufficient to adequately plead Defendants' scienter for a forward-looking revenue projection until after the publication of the Cease-and-Desist Order on August 7, 2018.

**NO SAFE HARBOR**

101.    Sonus's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. None of the warnings Defendants issued was meaningful because none warned that Sonus could not achieve the First Quarter 2015 revenue estimate and/or projection. To the extent that projected revenues and earnings were included in the Company's financial reports, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

102.    Defendants are also liable for any false or misleading forward-looking statement pleaded because, at the time each forward-looking statement was made, Defendants knew that the forward-looking statement was materially false or misleading and that the forward-looking statement was authorized and/or approved by an executive officer of Sonus who knew that the forward-looking statement was false.

**LOSS CAUSATION/ECONOMIC LOSS**

103.    The market for Sonus securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Sonus securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Sonus securities relying upon the integrity of the market price of Sonus securities and market information relating to Sonus and have been damaged thereby.

104.    During the Class Period, as detailed herein, Defendants knowingly made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of Sonus securities and operated as a fraud or deceit on Class Period purchasers of Sonus securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Sonus securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Sonus securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

105.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Sonus's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Sonus and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Sonus securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Sonus securities was removed and the price of Sonus securities declined dramatically, causing losses to Plaintiffs and the other members of the Class.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

106.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Sonus securities during the Class Period that suffered compensable damages related to the securities violations alleged herein (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sonus securities and other publicly-traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sonus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

109.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sonus;

(c)     whether the Individual Defendants caused Sonus to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly in issuing false and misleading financial statements;

(e)     whether the prices of Sonus securities were artificially inflated during the Class Period because of the conduct of Defendants complained of herein; and

(f)     whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

112.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Sonus's securities are traded in an efficient market;

(d)     The Company traded on NASDAQ, and was covered by multiple analysts;

(e)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(f)     Plaintiffs and other members of the Class purchased and/or sold Sonus securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

113.     As a result of the foregoing, the market for Sonus's common stock promptly digested current information regarding Sonus from all publicly available sources and reflected such information in Sonus's stock price. Under these circumstances, all purchasers of Sonus's common stock during the Class Period suffered similar injury through their purchase of Sonus's common stock at artificially inflated prices, and a presumption of reliance applies.

114.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

115.     Alternatively, Plaintiffs and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972) as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Promulgated**
**Thereunder Against Defendants Sonus and Greenquist**

116.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

117.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

118.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sonus securities during the Class Period.

119.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonus securities. Plaintiffs and the Class would not have purchased Sonus securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

121.    The Individual Defendants acted as controlling persons of Sonus within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Sonus securities, the Individual Defendants had the power and authority to cause Sonus to engage in the wrongful conduct complained of herein. Sonus controlled the Individual Defendants and all of the Company's employees.

122.    By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 19, 2019

Respectfully submitted,

By: */s/ Daryl Andrews*
**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO# 122010)
Daryl Andrews (BBO# 658523)
265 Franklin Street, Suite 1702
Boston, MA 02110
617-936-2796
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

BY: */s/ Garth A. Spencer*
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
212-682-5340
GSpencer@glancylaw.com

By: */s/ Jacob A. Goldberg*
**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg
Gonen Haklay
jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
(215) 600-2817
jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

***Counsel for Plaintiffs and the Class***

## **CERTIFICATE OF SERVICE**

I, Daryl Andrews, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: July 19, 2019

/s/ *Daryl Andrews*
Daryl Andrews