UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-12344-GAO

RON MILLER, individually and on behalf of all others similarly situated,
Plaintiff,

v.

SONUS NETWORKS, INC., RAYMOND P. DOLAN, MARK T. GREENQUIST,
and MICHAEL SWADE,
Defendants.

OPINION AND ORDER
October 20, 2022

O'TOOLE, D.J.

Lead plaintiffs Guiseppe Veleno and Gary Williams and named plaintiff Ron Miller (collectively "the plaintiffs") brought this suit against Sonus Networks, Inc. ("Sonus") and three of its executives (collectively "the defendants"), on behalf of themselves and a putative class of others who purchased Sonus common stock between January 8, 2015, and March 24, 2015 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"). The plaintiffs claim that they were misled by revenue forecasts issued by the defendants and, in reliance on those projections, suffered harm when they purchased the company's stock at prices artificially inflated by the defendants' unrealistically optimistic statements. The defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint. For the reasons set forth herein, the defendants' motion to dismiss is denied.

**I.**     **Factual Background**

The following is a summary of the factual allegations set forth in the amended complaint, which are accepted as true for the purpose of the pending motion to dismiss:

Sonus is a Massachusetts-based company that provides business solutions related to secure communication infrastructures. Sales of Sonus products are directed through a sales team who track and report confirmed as well as anticipated sales to management through an internal software program called Salesforce. Each quarter, Sonus gathers projected sales from that database to produce a revenue forecast.

In September 2014, the defendant Michael Swade assumed the role of Sonus's Vice President of Worldwide Sales. Swade, with approval from the defendants Raymond Dolan, Sonus's Chief Executive Officer and President, and Mark Greenquist, Sonus's Chief Financial Officer, altered the way in which Sonus had been forecasting expected future revenue. Rather than including each salesperson's "commit number," reflecting realistic expected sales for an employee in the particular time period as Sonus had done historically, Swade opted to base sales forecasts on the employee's "stretch number," which represented estimated sales for an employee in a best-case scenario. The plaintiffs allege that Swade insisted that sales employees report their more optimistic "stretch numbers" as "commit numbers." If they refused, they were subject to termination.

The plaintiffs allege that as Q1 of 2015 approached, Swade, Dolan, and Greenquist, who each individually had access to the Salesforce data, were made aware by senior salespersons in weekly meetings that it was unlikely that Sonus would meet the sales goals as reflected in the existing first quarter sales forecast. The plaintiffs further allege that Sonus "pulled forward" approximately $18.7 million of product sales that had initially been projected to close in 2015 in

order to achieve its revenue forecasts for Q4 2014. Nonetheless, on October 23, 2014, during a Q3 2014 earnings conference call, the defendants announced "comfort" with analysts' consensus estimate of $74 million for Q1 2015.

The plaintiffs identify statements made by the defendants on two dates, January 8, 2015, and February 18, 2015, that the plaintiffs allege were both materially false and misleading by reason of the defendants' knowingly unrealistic optimism.

A.   The January Statement

On January 8, 2015, the first day of the claimed Class Period, Sonus issued a press release reaffirming the substance of the prior October "comfort" statement. Greenquist, directly quoted in the release, expressed that "Sonus 'remain[ed] comfortable with analyst revenue . . . estimates for the first quarter of 2015 of approximately $74 million.'" (Am. Class Action Compl. for Violations of the Federal Securities Laws ¶ 61 (dkt. no. 44).) However, the amended complaint alleges, this disclosure was materially false and misleading because the prediction regarding the Q1 2015 forecast was known to the defendants to be unrealistic.

Greenquist received reports indicating that Sonus's quarterly backlog—revenue expected from products sold but not yet shipped, delivered, and accepted—was significantly lower than in previous years. Sonus's Vice President of Global Operations had sent emails to Greenquist in both October and November 2014, opining that $66 million was a more reasonable revenue projection and addressing Greenquist's refusal to approve "any objective commentary towards Q1 at $76M being high risk." (Id. ¶ 57.) It is alleged that Greenquist himself later echoed those concerns, stating on January 5, 2015, to Dolan and Sonus's head of investor relations, "I'm not confident that we can re-affirm 1Q . . . 4Q has shaken my confidence in anything that Sales tells me." (Id. ¶ 58.) A few days later, on January 7, the date when all shortfall potential sales and forecasts for Q1 2015

3

were required to be made, reports from the sales force showed a shortfall of nearly 15% from the prior $74 million estimate. The plaintiffs allege that despite knowledge that the forecast was unattainable, the defendants the very next day publicly reiterated the company's "comfort" with the $74 million figure.

B.   The February Statements

On February 18, 2015, Sonus issued a press release that reiterated the previous revenue forecast of $74 million for Q1 2015. On the same day, in a company earnings conference call, when asked for revenue guidance for Q1 2015, Greenquist stated: "[L]ooking at Q1, we expect revenue to be approximately $74 million." (Id. ¶ 75.) The plaintiffs allege that the defendants' statements were materially false and misleading because the defendants knew that even if every deal in the best-case scenario projection came to fruition, the company would still miss the Q1 2015 revenue forecast.

Between the January and February statements, Sonus had held an internal global sales conference, during which Swade instructed Regional Vice Presidents for Sales and their sales teams to close the looming gap in the "committed" pipeline. One of the Vice Presidents emailed his team, who was expressing discomfort with the direction, "I've asked many of you to move deals that are still speculative into Q1 Commit and go get. This was a directive from my management to find a path to the company's quarterly number. All I can ask is that you pull forward anything possible, and do your best." (Id. ¶ 65.) The reclassification resulted in the addition of $12.4 million in predicted Q1 revenue to the "committed" pipeline.

After the conference and before the February statements, Swade and other executives received repeated warnings from company employees that the reclassified deals were high risk. In the second week of February, $5 million in anticipated revenue was subtracted from the Q1

committed pipeline by sales team members. All Sonus senior executives, including the defendants, received reports of this drop before their February statements. The plaintiffs allege that the defendants, who were closely involved in monitoring sales at the company, knew a significant miss was imminent and that, consequently, the cautionary risk disclosures made during the February call were themselves materially misleading.

C.   Subsequent Events

Between February 18 and March 24, 2015, the Sonus sales team removed approximately $20 million in revenue from the Q1 "committed" pipeline. Before the market opened on March 24, 2015, the last day of the alleged Class Period, Sonus issued a press release that disclosed the significant Q1 2015 revenue miss, indicating that instead of the $74 million projected, Sonus only expected revenue between $47 and 50 million. In response, Sonus shares dropped dramatically, from $13.16 to $8.70 per share, resulting in a loss of over 33%.

On April 22, 2015, the defendants held a Q1 2015 earnings conference call, during which, the plaintiffs allege, blame for the shortfall was placed on "longer sales cycles" and the company's sales team. (Id. ¶¶ 89, 93.)

In August 2018, the Securities and Exchange Commission ("SEC") issued a press release and cease and desist order ("SEC Order"), publicizing that the company, Greenquist, and Swade had been charged with making material misstatements on both January 8, 2015, and February 18, 2015. The SEC Order and press release disclosed information previously unavailable to the plaintiffs. The SEC reached a settlement with the defendants in which the company, Greenquist, and Swade agreed to pay $1.97 million in civil penalties without admitting responsibility.

In 2016, a prior class action complaint against Sonus had been brought asserting many of the same allegations as those set forth in the present action. Sousa v. Sonus Networks, Inc., 261 F.

Supp. 3d 112 (D. Mass. 2017). At issue were two dates when statements were made by the defendants, October 23, 2014, and, as alleged in this action, February 18, 2015. This Court concluded that the October statement constituted non-actionable corporate puffery and that the allegations pled in that case concerning the February statements fell short of alleging a "strong inference" of scienter. Id. at 121.

The plaintiffs here, in the amended complaint, advance many of the same allegations as those set forth in Sousa. However, the October 23, 2014, statement relied on by the Sousa plaintiffs has been replaced by the statement, cited above, made on January 8, 2015. Further, the amended complaint includes additional facts previously unknown to the plaintiffs that were drawn from the subsequent SEC Order.

**II.     Discussion**

A.     Legal Standard

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter" so that each claim for relief is "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). For a claim to be facially plausible, the factual content must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Moreover, in assessing the merits of a motion to dismiss, the court must "accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

B.     Statute of Limitations

As an initial matter, the defendants argue that the plaintiffs' claims asserted in this action are barred by the applicable two-year statute of limitations because they merely mirror and add

detail to the claims previously alleged in Sousa. Pursuant to the statute, claims brought under Section 10(b) and Rule 10b-5 must "be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). For purposes of commencing the statutory clock, the statute's use of the term "discovery" encompasses all facts "constituting the violation," including facts showing scienter, and "refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." Merck & Co., v. Reynolds, 559 U.S. 633, 644 (2010) (emphasis in original). The defendants' argument hinges on whether a reasonably diligent plaintiff should and would have discovered the expanded factual allegations regarding scienter set forth in the present amended complaint.

The defendants contend that the essence of the plaintiffs' allegations have been discoverable since 2015 and, in support of this contention, claim that such allegations were discoverable "*because they were actually discovered* by the SEC." (Mem. in Supp. of Defs.' Mot. to Dismiss at 16 (dkt. no. 49) (emphasis in original).) That is a non sequitur. While the underlying allegations may have been uncovered by the SEC through its investigation, there is nothing in the record to support the conclusion that a reasonably diligent plaintiff, lacking the SEC's authority and tools, would have discovered the facts later made public in the SEC Order and now asserted by the present plaintiffs in alleging plausible scienter. "[I]rrespective of whether the actual plaintiff undertook a reasonably diligent investigation," the clock does not begin to run until a reasonably diligent plaintiff would have discovered the facts "constituting the violation." Merck, 559 U.S. at 653.

The defendants have not shown that the Sousa plaintiffs would or should have discovered facts that ultimately were only disclosed in the subsequent SEC investigation. The present

plaintiffs have alleged facts that became publicly available precisely because of their disclosure by the SEC investigation. The present action was filed within the limitations period that commenced as of the date of the publication of the SEC's findings and order. Under conventional discovery principles, the plaintiffs' action was timely commenced.

C.   Section 10(b) Claims

To state a viable claim of securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017) (quoting Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015)). The plaintiffs must additionally satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011). The PSLRA requires that a complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." Id. § 78u–4(b)(1).

    *i.   January Statement*

The defendants claim that the January statement is merely a reiteration of the October 23, 2014, statement of "comfort" with analysts' consensus revenue estimate for Q1 2015 and should receive the same evaluation as it was accorded in Sousa as "non-actionable corporate puffery." 261 F. Supp. 3d at 119. The present complaint alleges in substance that any basis for optimism that may have existed in October was no longer realistic in January. The sales force was expressing more pessimism about meeting announced goals and internal company communications made

acknowledgments of the significant concerns surrounding the revenue forecast as it stood. The facts alleged as of the January statement are therefore more plausibly supportive of scienter.

### ii.     February Statements

In Sousa, the allegations based on the February statements were also dismissed as insufficient allegations of scienter. 261 F. Supp. 3d at 119. However, the present plaintiffs have added factual allegations that make a conclusion of scienter more plausible than in the prior action.

"Scienter is defined as either the 'intentional or willful conduct designed to deceive or defraud investors' or 'a high degree of recklessness.'" Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 158 (1st Cir. 2019) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d at 41). To make a showing of scienter, a plaintiff must "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 57 (1st Cir. 2018) (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). For purposes of scienter, recklessness refers to "'a highly unreasonable omission' involving 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Leung v. bluebird bio, Inc., No. 21-cv-10335-DJC, 2022 WL 1192801, at *6 (D. Mass. Apr. 21, 2022) (quoting Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017)).

A securities fraud claim brought under section 10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" requires that it be "more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing* inference of nonfraudulent intent." Constr. Indus. & Laborers Joint Pension Trust v. Carbonite, Inc., 22 F.4th 1, 9 (1st Cir. 2021)

(quoting Mehta v. Ocular Therapeutix Inc., 955 F.3d 194, 206 (1st Cir. 2020)) (emphasis added). "When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011). In other words, if an inference of scienter is equally as plausible as other potential inferences of non-liability, the drawing of a particular inference is a determination reserved for the factfinder.

The amended complaint pleads allegations to support scienter that were not pled in Sousa. The present plaintiffs focus on three allegations: the defendants' refusal to take seriously the concerns of the sales team surrounding the revenue forecast; the insistence at the sales conference that the sales team reclassify uncertain sales to the "committed" pipeline; and the reduction of sales by approximately $5 million from the Q1 committed pipeline in advance of the February statements. By alleging specific instances in the months leading up to the February statements that indicate when the defendants became "aware of facts that should have made them aware of the falseness of their optimistic statements," see Sousa, 261 F. Supp. 3d at 120, the present plaintiffs make a sufficient showing of scienter.[1]

D.   Section 20(a) Claims

The plaintiffs further assert claims under Section 20(a) of the Exchange Act against the individual defendants, Dolan, Greenquist, and Swade, for liability as controlling persons of Sonus. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a violation under 10(b). 15 U.S.C. § 78t(a). Such claims "only create[] liability derivative of an underlying securities violation." ACA Fin. Guar. Corp., 512 F.3d

---

[1] Although the plaintiffs do not plead proof of motive, such a showing is not required to make out a Section 10(b) claim. Id.

at 67–68. Because the plaintiffs have pled a viable Section 10(b) claim, the Section 20(a) claims may also proceed.

### III.    Conclusion

For the foregoing reasons, the defendants' Motion to Dismiss (dkt. no. 48) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.<br>
United States District Judge